**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No. 9:23-cv-80911-CANNON

ESTATE OF RICO MARLES, by and
through Brenda Leigh Marles; BRENDA
LEIGH MARLES, individually,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____/

**DEFENDANT UNITED STATES OF AMERICA'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, United States of America, pursuant to Federal Rule of Civil Procedure 56 and

Southern District of Florida Local Rule 56.1, moves for summary judgment in its favor on Count

1, the sole claim remaining in the Amended Complaint [D.E. 9] because Plaintiff cannot as a matter

of law establish the elements of medical negligence relating to the treatment received by Rico

Marles in the emergency department at the West Palm Beach Department of Veterans Affairs

Medical Center, and his later suicide at his home. In support[1], Defendant states as follows:

---

[1] The Parties' Joint Statement of Undisputed Facts, D.E. 53, shall be referred to as "JF" and
Defendant's Statement of Material Facts, D.E. 54, shall be referred to as "SMF" in this Motion.

## **INTRODUCTION**

In January 2021, during the height of the COVID-19 pandemic, Rico Marles was treated at the emergency department of the West Palm Beach Veterans Affairs Medical Center ("WPB VAMC"), for medical complaints, as well as anxiety he reported related to concern over having COVID-19. This was a common complaint in emergency rooms across the country during the height of the global pandemic, when emergency room physicians were on the front lines every day risking their lives to combat this life-threatening virus. In fact, on March 1, 2020, Governor Ron DeSantis issued an executive order directing the Florida Department of Health to issue a Public Health Emergency due to COVID-19. On March 9, 2020, Governor DeSantis issued another executive order declaring a state of emergency for the State of Florida as a result of COVID-19.[2]

Rico Marles eventually committed suicide 24 hours after his second visit to the ED, at his home shared with his wife, Brenda Marles. At both emergency department ("ED") visits, Rico Marles denied suicidal ideation and had a negative screen for suicidal ideation based on his answers to the Columbia Suicide Severity Rating Scale (C-SSRS) screen (the "Columbia screen"), (JF ¶ 8, 20, 21)  a screening tool relied upon by practitioners in emergency departments and private practice across the country to assess suicide risk.[3] Every patient in the ED at WPB VAMC is screened for suicidal intent using the Columbia screen, regardless of the reason for their visit.  SMF

---

[2] *See* State of Fla., Office of the Governor, Executive Order No. 20-316 (Dec. 29, 2020) (extending for 60 days to original state of emergency for the entire state due to COVID-19) *available at* https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-316.pdf (last visited July 24, 2024); Fla. Dep't of Health, Emergency Order (Dec. 23, 2020) (continuing state of emergency as announced on March 20, 2020), *available at* https://www.floridahealth.gov/diseases-and-conditions/respiratory-illness/COVID-19/_documents/news/2020/12/Emergency-Order-DOH-No.-20-015.pdf (last visited July 24, 2024).

[3] The Joint Commission, which accredits and certifies hospitals lists the Columbia screen as an option in furtherance of one of its National Patient Safety Goals for suicide prevention. *See* https://www.jointcommission.org/-/media/tjc/documents/resources/patient-safety-topics/suicide-prevention/r3_18_suicide_prevention_hap_bhc_5_6_19_rev5.pdf?db=web&hash=887186D9530F7BB8E30C28FE352B5B8C (last visited July 24, 2024).

¶¶ 2.  When asked directly by WPB VAMC staff who treated him, Rico Marles also denied suicidal thoughts or intent to harm himself or others. JF ¶¶ 8, 20; SMF ¶¶ 19, 31.  Brenda Marles concurred that Rico Marles was concerned he had COVID-19, and encouraged him to go get tested.  JF ¶ 5.  Brenda Marles had no concerns Rico Marles was suicidal that weekend, and stated he had no mental health complaints at all.  SMF ¶¶ 14-15.  At the end of his visit on January 15, Rico Marles was informed by Dr. Hema Pandit about the Unit 1C walk-in mental health clinic ("MHC") down the hall from the ED and which offers same-day appointments, but he did not go even though the MHC was still open that afternoon.  SMF ¶ 4-5, 24-27, 30.  At the end of his second ED visit on January 18, Dr. Timothy Huber prescribed a short course of low-dose lorazepam, because Rico Marles asked for a medicine to treat his anxiety due to his fear of having COVID-19 and trouble sleeping. SMF ¶ 33; JF ¶ 24.  Despite walking out of the ED with the lorazepam in hand, he did not take it.  SMF ¶ 37; JF ¶ 28.

However, despite this, Plaintiff Brenda Marles, acting as the personal representative for the Estate of Rico Marles[4], now second guesses the care provided by these emergency room physicians working in the height of a global pandemic. Plaintiff asserts in Count 1 a wrongful death claim based upon her allegations that the care received by Rico Marles in the emergency department on January 15 and January 18 fell below the standard of care. Plaintiff specifically identifies "failures" in subparts of paragraph 54 of the Amended Complaint and contends that Rico Marles's suicide could have been prevented if any one of these specific actions had been taken. Plaintiff also does not identify with requisite specificity the identity of providers who committed the purported breaches, as required by the FTCA and 38 U.S.C. § 7316.[5]

---

[4] The Amended Complaint also included Count 2 brought by Brenda Marles personally, alleging for negligent infliction of emotional distress that was dismissed by the Court. D.E. 47.

[5] The FTCA only waives sovereign immunity for acts and omissions of federal employees *See* 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2671. Even more specific is a statutory provision specific to VA medical providers in the context of FTCA actions. 38 U.S.C. § 7316(a)(1)(A). Section 7316(a)(2) defines "health care employee of the Administration" to include a physician. 38 U.S.C. §

Defendant is entitled to summary judgment in its favor on two bases.  First, Florida's Good Samaritan Act, section 768.13, Florida Statutes (the "GSA") provides civil immunity to medical providers providing emergency services unless their actions or inactions evidenced a "reckless disregard."  Plaintiff has no allegation in the Amended Complaint that either Dr. Pandit on January 15, or Dr. Huber on January 18, or any other medical provider in the ED, acted with a reckless disregard.  Fatally, Plaintiff also has no expert opinion that Dr. Pandit or Dr. Huber acted with a reckless disregard. Therefore the claim fails as a matter of law.  Second, even if the Court finds the GSA did not apply to the facts here, Plaintiff cannot establish a claim for medical negligence as a matter of law since there is no duty to prevent suicide which occurs outside of Defendant's custody and control, and Plaintiff cannot establish proximate cause between the care provided in the ED and Rico Marles's independent and intervening act of suicide.  While it is undoubtedly a sad event when anyone takes their life, it is not due to any action or inaction of Defendant for the reasons explained below, and summary judgment must be entered in favor of Defendant.[6]

---

7316(a)(1)(B).  Plaintiff does not identify the specific employees in her Amended Complaint or in the narrative attached to her SF-95 during the administrative process. Defendant has further addressed these deficiencies in its Rule 12(b)(1) Motion and Motion to Exclude Stephen Bruce, filed contemporaneously with this motion.

[6] Defendant also moves for summary judgment in its favor on any potential argument by Plaintiff to argue an admission of fault, breach of the standard of care, or similar, based on any statements made that the Institutional Disclosure of Adverse Event held on October 19, 2021, that Plaintiff repeatedly purports to (incompletely) quote in the Amended Complaint. *See* Am. Compl. ¶¶ 40-52.  This is a non-issue as VA employees do not have authority to admit liability on behalf of the VA.  Plaintiffs in other cases have unsuccessfully tried to assert a similar argument relying on the same exact VHA Directive 1004.08 cited by Plaintiff, and lost.  *Lyons v. United States*, No. 1:20-cv-01120-JMS-DLP, 2021 WL 5359599 (S.D. Ind. 2021) (conducting in-depth analysis of VHA Directive 1004.08 and finding statements made at an institutional disclosure is not an admission of liability);  *Aubert v. United States*, No. 09–3566.2011 WL 1558787 (E.D. La. 2011) (discussing how the institutional disclosure meeting was not an admission of liability).  In fact, the directive requires such a meeting be held with a patient or their representative and expressly states that it is not an admission of liability.  No one who participated meant their statements to be an admission of liability.  See SMF ¶ 65-66.  Therefore, the Court should grant judgment in favor of Defendant on this theory of liability, should Plaintiff pursue it.

## STANDARD OF REVIEW

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Marler v. U-Store-It Mini Warehouse Co.,* 09-60613-CIV, 2010 WL 11506367, at *3 (S.D. Fla. July 20, 2010), *aff'd,* 416 F. App'x 49 (11th Cir. 2011).

In opposing a motion for summary judgment, the Supreme Court has famously explained that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). Rather, "[T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* at 586-87 (emphasis in original). Likewise, the Court should not "weigh the evidence and determine the truth of the matter, but determine whether there is a genuine issue [of material fact] for trial." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Id.* at 252.

## ARGUMENT

The medical providers at WPB VAMC who provided emergency care services to Rico Marles are immune from civil liability under Florida's Good Samaritan Act, section 768.13, Florida Statutes (the "GSA") in the absence of action or inaction establishing a reckless disregard, which is beyond mere negligence.  There are **no** allegations in the Amended Complaint that any action or inaction taken by anyone at WPB VAMC was a breach of the standard of care at the reckless disregard standard. *See generally* Am. Compl. at D.E. 9. Plaintiff also has absolutely no

expert opinion on this point (SMF ¶ 41), and thus, the claim fails as a matter of law because Plaintiff is unable to establish a breach of the relevant standard of care set forth in the GSA.

Second, even if the Court concludes that the GSA reckless disregard standard does not apply in this case, Plaintiff also cannot establish the elements of medical negligence under Florida law relating to the outpatient care received by Rico Marles in the ED on January 15, 2021, and January 18, 2021. Summary judgment in Defendant's favor is therefore warranted.

## Legal Standard for Plaintiff's Sole Claim of Medical Negligence

In FTCA cases such as this, the Court determines liability by applying the appropriate law of the forum state. 28 U.S.C. §§ 1346(b), 2674; *see Massey v. United States*, 733 F.2d 760 (11th Cir. 1984).  An action under Florida's Wrongful Death Act shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages caused by the injury resulting in death. *See* §§ 768.19-768.21, Fla. Stat.  When a wrongful death claim is based on negligence, the claim of negligence must successfully be proven. *Phelps v. Delphi Behavioral Health Grp., Ltd. Liab. Co.*, No. 19-61557-CIV-SINGHAL/VALLE, 2023 U.S. Dist. LEXIS 7708, at *5 (S.D. Fla. Jan. 17, 2023).

The elements of a medical negligence claim in Florida are: "(1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Cantore v. W. Boca Med. Ctr., Inc.*, 254 So. 3d 256, 260 (Fla. 2018) (quoting *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014) (additional citation omitted). Therefore, since Plaintiff's claims are pled and premised upon theories of medical malpractice, Plaintiff must also establish "the standard of care owed by the defendant, the defendant's breach of the standard of care, and proximate causation between the breach and the damages claimed." *Whittaker v. Sanchez*, No. 19-13486, 2021 WL 4495808, at *3 (11th Cir. Oct. 1, 2021) (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)).

The statutory provision governing medical negligence actions in Florida is section 766.102, Florida Statutes, defines the standard of care as:

> The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

§ 766.102(1), Fla. Stat.  "In medical malpractice cases, the standard of care is determined by a consideration of expert testimony." *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995)) (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)); § 766.102(1), Fla. Stat.

Furthermore, '[t]he existence of a medical injury does not create any inference or presumption of negligence against a health care provider, and the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider." § 766.102(3)(b), Fla. Stat. This is due to the "specialized knowledge necessary to show what a 'reasonably prudent' physician would consider 'acceptable and appropriate'[.]" *Jerrett v. United States*,  No. 5:20-cv-134-KKM-PR, 2022 WL 599200, at *2 (M.D. Fla. Feb. 11, 2022) (citing *Pate* and *Chirillo v. Granicz*, 199 So. 3d 246, 252 (Fla. 2016)). "Where a plaintiff in a medical negligence action does not establish what standard of care existed under the circumstances of the case, and therefore is unable to show a breach of such care, a directed verdict is appropriate." *Cagle v. United States*, 738 F. App'x 633, 638 (11th Cir. 2018) (quoting *Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981). "If a defendant shows that a plaintiff is unable to present evidence of the negligence that he alleges in his complaint, then no genuine issue of material fact exists and summary judgment may be granted in favor of the defendant." *Id.* (citing *Sims v. Helms*, 345 So. 2d 721, 724 (Fla. 1977)).

## I.    Florida's Good Samaritan Act Precludes Liability for the ED Physicians Who Treated Rico Marles

Since Rico Marles received emergency services at the WPB VAMC, Florida's Good Samaritan Act applies to limit liability of any medical providers.  Thus, Plaintiff must prove that Dr. Pandit and Dr. Huber acted with a "reckless disregard" as that term is defined in the statute in

order to impose liability on Defendant.  In addition to having no allegation constituting a reckless disregard (*see* Am. Compl. at D.E. 9), Plaintiff also has absolutely no expert opinion expressing that these two physicians' actions or inactions evidenced a reckless disregard.

The GSA provides immunity to "any health care provider … providing emergency services" as a result of any medical care or treatment unless it occurred "under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another." § 768.13(2)(b)1., Fla. Stat.  "Reckless disregard" is defined in the GSA as "conduct that a health care provider knew or should have known, at the time such services were rendered, created an unreasonable risk of injury as to the affect the life or health of another, and such risk was substantially greater than that which is necessary to make the conduct negligent."   § 768.13(2)(b)3., Fla. Stat.  Despite Plaintiff disclosing **three** standard of care experts, none expressed an opinion stating Dr. Pandit or Dr. Huber, or any other emergency medical provider, acted with a reckless disregard when treating Rico Marles on an emergency basis.  Instead, their opinions focused on the negligence standard of care. SMF ¶ 41.  Therefore, in the absence of any expert opinion on this issue, Defendant is entitled to judgment as a matter of law since Plaintiff cannot establish the standard of care was breached. *See Whittaker*, 2021 WL 4495808, at *3 (affirming summary judgment where plaintiff "did not present any expert medical testimony to establish the standard of care that FCC Coleman owed him, so he was unable to show that FCC Coleman breached any standard of care, and, as a result, was unable to establish the elements of medical malpractice").  Furthermore, as noted above, there is no allegation in the Amended Complaint (or even the administrative claim) that any of Defendant's employees acted with a reckless disregard when treating Rico Marles on an emergency basis. *See generally*, Am. Compl. at D.E. 9.

The GSA provides immunity to emergency services rendered pursuant to four different statutes, one of which is 42 U.S.C. § 1395dd, the "Emergency Medical Treatment and Labor Act"

("EMTALA")[7], which governs the provision of emergency medical services, and section 395.1041, Florida Statutes, the state equivalent. *See* 768.13(2)(b), Fla. Stat. The provision further explains that the immunity applies "prior to the time the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient" or "which is related to the original medical emergency." § 768.13(2)(b)2.a.-b., Fla. Stat.

The physicians at WPB VAMC are eligible for this immunity created by the GSA as they provided emergency services in accordance with EMTALA. SMF ¶ 1. WPB VAMC is not legally bound to comply with EMTALA, but it does nonetheless as a matter of protocol. SMF ¶ 1. Similarly, under the analogous state statute, providers at WPB VAMC are eligible for the protection of the GSA even though WPB VAMC is not licensed by the state under Chapter 395. *See Turner ex rel. v. United States* 514 F.3d 1194, 1204-05 (11th Cir. 2008) (agreeing immunity of prior version of the GSA applied to a U.S. naval hospital operating in Florida that provided emergency services even if the hospital is not explicitly licensed under Chapter 395). In *Turner*, the Eleventh Circuit held that the GSA applies to a federal government hospital, and rejected the argument that the hospital had to operate identically to a state hospital in order to claim the benefit of the GSA, and instead holding FTCA required "sufficiently analogous" care. *Id.* at 1205. The Court found that the naval hospital complied with the pre-requisites of the GSA, as it provided care to all persons within its beneficiary population regardless of ability to pay or discriminate against other protected categories. *Id.* at 1205-06. The court rejected the narrow view of the district court that the limited population group meant it was more like a specialty, private hospital. *Id.* at 1206. The same is true here, and the GSA also applies in this case.

---

[7] EMTALA "requires hospitals with emergency departments to provide a medical screening examination to any individual who comes to the emergency department and requests such an examination, and prohibits hospitals with emergency departments from refusing to examine or treat individuals with an emergency medical condition."

Rico Marles's treatment on January 15 and January 18 qualifies as "emergency services" under the GSA.  Rico Marles came to the ED expressing symptoms related to well-known life-threatening conditions, such as cardiac or pulmonary issues (JF ¶ 10), as well as symptoms and concerns related to having COVID-19, an emergency medical condition of high concern in emergency departments across the country at that time which necessitated that hospitals operate under a state of emergency as ordered by the Governor of Florida. For example, in the week immediately preceding Rico Marles's visit (i.e. ending January 9, 2021), there was the highest total number of deaths involving COVID-19 since tracking of deaths started, totaling 26,028.[8]

Once a patient is in the ED, it is an emergency situation until a physician determines they are stable and ready for discharge.  *See University of Fla. Bd. of Trustees v. Stone ex rel. Stone*, 92 So. 3d 264, 269-70 (Fla. 1st DCA 2012) (evaluating as a matter of first impression what constitutes "emergency services" under the GSA and concluding "those provided for the diagnosis or treatment of an emergency medical condition prior to the time the patient is stabilized and capable of receiving treatment as a nonemergency patient.").[9]  Here, Plaintiff's allegations in the Amended

---

[8] CENTERS FOR DISEASE CONTROL, Nat'l Ctr. for Health Statistics, Table 1, "Deaths Involving COVID-19, pneumonia, and influenza reported to NCHS by time-period and jurisdiction of occurrence." https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm   (last accessed July 29, 2024). It is easy to forget the seriousness of COVID-19 with the passage of time, but the total number of deaths in the United States involving COVID-19 through July 25, 2024, is 1,197,745. *Id.*  It is important to remember this context when evaluating Plaintiff's allegations and her second guessing of the emergency room physicians who treated Rico Marles in January 2021 in the height of this pandemic..

[9] Although a slightly different term, and persuasive to Eleventh Circuit in *Turner,* Chapter 395 defines  "Emergency services and care" as

> medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an emergency medical condition exists and, if it does, the care, treatment, or surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the service capability of the facility.

Complaint relate only care received by Rico Marles on an emergency basis while he was in the ED, and therefore, before he was deemed stable and discharged. Therefore, the care provided on January 15 and January 18 qualifies as "emergency services" under the GSA and the reckless disregard standard applies.

Like in *Turner*, the treatment provided at WPB VAMC is entitled to the same immunity under the GSA since the care provided was sufficiently analogous to that of a Florida-licensed hospital providing emergency services. On the two occasions when Rico Marles came to the ED at WPB VAMC, the ED physicians had an obligation to evaluate and treat Rico Marles's emergency medical conditions to ensure he was stable for discharge and able to obtain non-emergency treatment. For example, on January 15, Rico Marles was at the ED for three hours (*compare* JF ¶ 6 (first treatment at 12:10 p.m.) *with* SMF ¶ 26 (discharge at 3:10 p.m.) and it is undisputed he underwent a battery of tests to rule out life-threatening conditions. JF ¶ 12. Thus, the treatment provided by Dr. Pandit and Dr. Huber met criteria for GSA immunity. Since Plaintiff has no expert testimony that care provided at either visit evidenced a "unreasonable risk of injury" and that "such risk was substantially greater than that which is necessary to make the conduct negligent" as defined in section 768.13(2)(b)3, Plaintiff cannot meet her burden of establishing a breach of the standard of care and therefore judgment must be entered for Defendant as a matter of law.

## II. Plaintiff Cannot Establish the Elements of Medical Negligence as a Matter of Law

### a. No duty to prevent suicide in an outpatient setting and emergency department physicians met the statutory standard of care

---

§ 395.002(9), Fla. Stat. "Thus, 'emergency services and care' begins when a physician undertakes a medical screening, examination, or evaluation *to determine whether an emergency medical condition exists*." *Cespedes v. Yellow Transp., Inc.*, 130 So. 2d 243, 250 (Fla. 1st DCA 2013) (emphasis added).

By this action, Plaintiff seeks to impose liability on Defendant for the suicide of Rico Marles which occurred at his home and when he was outside of the custody and control of WPB VAMC.  Florida law is clear that there is no duty to prevent suicide in an outpatient setting.  *Garcia v. Landmark Hospitals of Florida*, 754 So. 2d 48 (Fla. 3d DCA 1999).  While "[o]ne can assume such a duty by taking custody and control over another," a legal duty to prevent self-inflicted harm requires "more than just foreseeability alone"; rather, such person must "be in a position to control the risk."  *Surloff v. Regions Bank*, 179 So. 3d 472, 475–76 (Fla. 4th DCA 2015).  The Florida Supreme Court recently confirmed only the statutory duty imposed under section 766.102, Florida Statutes would apply to an analysis of potential liability of an outpatient suicide.  *Chirillo v. Granicz,* 199 So. 3d 246, 252-53 (Fla. 2016).  Contrary to Florida law, Dr. Louis, Plaintiff's emergency medicine physician expert, seems to suggest a strict liability theory of negligence in an outpatient setting as he states "clearly, you can tell by the fact that he killed himself within 24 hours that somebody missed something."  SMF ¶ 47.  This is not the law.  In fact, refuting any assertion of reckless disregard, Dr. Louis stated ED physicians can only do their best based on information provided. SMF ¶ 42. Thus, as explained below, Plaintiff is unable to establish a duty was owed by WPB VAMC providers to prevent the suicide that occurred at Rico Marles's home.

In *Garcia*, the patient was admitted to an emergency room after overdosing on numerous medications.  The treating emergency room doctor diagnosed it as an accidental overdose and performed a gastric lavage before discharging the patient.  *Garcia*, 754 So. 2d at 48-49.  The doctor did not request a psychiatric consult or recommend voluntary admission to the hospital or to a psychiatric facility for further evaluation or treatment.  *Id.* at 49.  There is no indication from the opinion if a suicide screen was performed.  Two days later, the patient returned to the same emergency room and was treated by a different doctor after being involved in a car accident.  *Id.*  The patient left against medical advice before his physical work up was completed and committed suicide once he returned home.  *Id.*  The estate of the patient sued claiming hospital personnel

failed to note the visit two days earlier, failed to take a proper history, failed to request a psychiatric

consult, and failed to speak with the patient's family.  *Id.*

In holding that there was no duty for the emergency room doctors to treat the patient for

his psychiatric issues, the Third DCA noted that both doctors:

> [T]reated [the patient] in an emergency room setting, where the fast
> paced atmosphere does not lend itself to the establishment of a close,
> personal relationship between physician and patient. The nature of
> an emergency room physician's job is to treat the patient for the
> medical emergency which brought them there, and move on.

*Id.* The *Garcia* court further explained that "[d]octors do not have a duty to treat each of their

patients for every conceivable medical condition that they might have." *Id.*  In declining to extend

the duty to treat psychiatric issues, the court noted that given the nature of psychiatry, "internal

workings of the human mind remain largely mysterious" *Id.* (additional citations omitted).  Thus,

the court concluded that the doctor/patient relationship did not "create[] a duty for these physicians

to perform a variety of psychiatric functions …." *Id.* at 50.

Like in *Garcia*, Rico Marles presented to the ED complaining of a host of physical

symptoms, including a suspected COVID-19 infection, but importantly, denying suicidal ideation.

JF ¶ 7-8, 19- 21; SMF ¶ 19, 31.  The ED physicians here, like those in *Garcia*, did not have an

active, established medical relationship with Rico Marles aside from the immediate need to treat

the emergent issues presented to them at the time of his visit.  Dr. Pandit and Dr. Huber treated the

issues giving rise to the respective visit, and discharged him as appropriate.  This is even more

significant during the time of Rico Marles's presentation, at the height of the COVID-19 pandemic

in a busy emergency department.  *See* fn. 8, *supra*, SMF ¶¶ 6, 7.  It is undisputed Rico Marles

received most of his care, including prescription medications, outside of the VA system. JF ¶ 3;

SMF ¶¶ 8-10.  Thus, considering Rico Marles's medical complaints based on his presentation at

the specific visits and statements and his denial of suicidal ideation, it was not reasonable to expect

the physicians owed him a duty to treat for psychiatric issues that were not disclosed in his

responses to the screening and questioning pertaining to self-harm asked by the doctors and nurses in the ED.[10]

Plaintiff's suggestion of alternative actions/scenarios in her Amended Complaint is exactly the danger warned of by the *Garcia* court that is not proper to impose hypothetical alternative treatments upon emergency department physicians who have a limited relationship with the patient and the focus is to treat the emergent issue and discharge,. *See* 754 So. 2d at 49. Once Rico Marles was deemed stable, both physically and psychologically, discharge from the ED was appropriate. Even Plaintiff's experts agree a patient with psychological complaints can be safely discharged from the ED.  SMF ¶ 45.  This is what happened here.

Thus, given the above, Plaintiff is unable to establish that Defendant had a duty to prevent Rico Marles's suicide which occurred at his home when he was outside the custody and control of Defendant.

### b.  Plaintiff Cannot Establish Causation as a Matter of Law

Summary judgment is also appropriate here as Plaintiff cannot establish the element of causation as a matter of law.  The Florida Supreme Court set forth the standard for proving proximate cause in *Gooding*. The court quoted Prosser, *Law of Torts* § 41 (4th ed.1971) and wrote

> On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture,

---

[10] The limited instance when liability was imposed even in context of outpatient treatments was in a case involving specialized, extended outpatient psychiatric care relationship, coupled with negligence of medical doctors. *See, e.g., Perez v. United States*, 883 F. Supp. 2d 1257 (S.D. Fla. 2012) (finding liability when facility was exclusive provider of psychiatric care over a 3 year period, including multiple inpatient psychiatric stays, outpatient psychiatric appointments, and numerous active psychiatric prescriptions to treat the patient's severe delusions, paranoia, and suicidal ideations).  This is not the case here. JF ¶ 3; SMF ¶¶ 8-10.

> or the probabilities are at best evenly balanced, it becomes the duty
> of the court to direct a verdict for the defendant.

*Gooding*, 445 So. 2d at 1018. The Eleventh Circuit has written similarly. *See Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 224 (11th Cir. 2021) ("A plaintiff does not 'sustain his burden of proof by relying on pure speculation.'") (quoting *Cox v. St. Josephs Hosp.*, 71 So. 3d 795, 799 (Fla. 2011)); *Hessen for Use & Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 647 (11th Cir. 1990) ("a mere possibility of causation is not enough").

There are two reasons Plaintiff cannot establish causation as a matter of law.  First, even if the Court finds that the care provided by Dr. Pandit or Dr. Huber did not meet the standard of care (which Defendant does not concede), Plaintiff cannot establish causation as a matter of law because Rico Marles's independent act of suicide was an intervening and superseding cause which broke the chain of causation and relieves Defendant of liability. Second, it was not reasonably foreseeable that Rico Marles would commit suicide as a result of any treatment he received on January 15 or January 18, when he denied suicidal ideations and his complaints largely centered on physical symptoms and anxiety related to COVID-19.

> i.   Rico Marles's Suicide as an Intervening Act Breaking the Chain of Causation

Rico Marles's independent act of suicide broke the chain of causation for purposes of liability.  While Florida case law on the "suicide rule" is limited, it is generally accepted that suicide is an independent and intervening cause which breaks the chain.  *See Surloff v. Regions Bank*, 179 So. 3d 472, 475 (Fla. 4th DCA 2015). An intervening cause will relieve the original tortfeasor of liability if unforeseeable and completely independent of, and not in any way set in motion by, the original tortfeasor's negligence. *East Coast Elec. v. Dunn*, 979 So.2d 1018, 1020 (Fla. 3d DCA 2008).

The question of whether a plaintiff's action or separate event is a superseding or intervening cause is generally a question of fact as it goes to the heart of proximate cause, but is a

question of law when reasonable minds cannot differ. *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116-1117 (Fla. 2005). *see Valdes v. Miami Herald Pub. Co*., 782 So. 2d 470, 471 (Fla. 3d DCA 2001) (per curiam) ("The issue of proximate cause generally presents a question of fact. However, the question of proximate cause is one for the court where there is an active and efficient intervening cause.") (internal citation omitted)). Here, for the reasons stated below, courts have found as a matter of law that reasonable minds cannot differ when the act of suicide was a superseding and intervening cause.  *See, e.g., Timson v. Juv. & Jail Facility Mgmt. Servs., Inc.*, No. 8:07-CV-1297-T-MAP, 2009 WL 10671134, at *7-9 (M.D. Fla. Apr. 24, 2009), *aff'd*, 355 F. App'x 283 (11th Cir. 2009) (applying Florida law and concluding on summary judgment that reasonable minds could not differ as to suicide was intervening cause and unforeseeability of inmate's suicide).[11] Thus, since it is undisputed that Rico Marles committed suicide at his home and not at the WPB VAMC, his suicide a day after he was discharged from the custody and control of WPB VAMC is an independent and intervening act which broke the causal chain of any alleged negligence (which Defendant disputes that there was any negligence in this case).   Other independent actions that broke the causal chain are his failure to follow medical advice when he did not go to the MHC on January 15 (SMF ¶ 30), or take the medication prescribed on January

---

[11] It is important to note that Florida law on foreseeability of inmate suicide is different and focuses on the information reasonably available to the jailor.  *See Timson*, at *5. As explained in detail in Defendant's Motion to Dismiss pursuant to 12(b)(1), and the Motion to Exclude Stephen Bruce, Ph.D., both filed contemporaneously with this Motion, Plaintiff appears to impose this standard on the VA to have done an extensive historical records review, which is improper. Even with this higher standard in *Timson* regarding the jailor's access to the information regarding the inmate, the court still concluded that, as a matter of law, the inmate's suicide was an intervening cause. *See also Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 681-82) (N.D. Ill. 2020) (discussing the Illinois general presumption that the injured party's voluntary act of suicide is an independent intervening act which is unforeseeable as a matter of law); *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Ed.*, 341 F. Supp. 3d 793, 810-11 (S.D. Ohio 2018) (citing general rule in Ohio is that "suicide constitutes an intervening force which breaks the line of causation stemming from the wrongful act, and, therefore, the wrongful act does not render the defendant civilly liable."); *Elliott v. Mgmt. & Training Corp.*, No. 3:16-cv-00088-MPM-JMV, 2017 WL 3089693 at *9 (N.D. Miss. July 19, 2017) (same in Mississippi).

18.  JF ¶ 28.

         ii.  <u>The Suicide was Not Reasonably Foreseeable when Rico Marles</u>
              <u>Presented with Physical Complaints and Concern over COVID-19</u>

Plaintiff also cannot prove causation because Rico Marles's suicide was not a reasonably foreseeable result of the conduct of Dr. Pandit or Dr. Huber.  In Florida, the injured party must show that the alleged tortfeasor "substantially caused the specific injury that actually occurred." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992); *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018) (citing *McCain*). A "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain*, 593 So. 2d at 503. In the absence of "a freakish and improbable chain of events" leading to injury, "the question of foreseeability as it relates to proximate causation generally must be left to the factfinder to resolve." *Id.* at 503-04.

Rico Marles's primary concern on January 15 and January 18 revolved around his belief that he had contracted COVID-19 and was experiencing symptoms.  JF ¶¶ 5, 21-24. Brenda Marles (who spent the entire weekend with Rico Marles) testified that he went to the ED for these physical, medical complaints, and wanted to get a COVID test.  JF ¶¶ 5, 17.  Before both visits, she described he reported feeling sick and achy, and had no mental health complaints.  JF ¶¶ 5, 17; SMF ¶ 15. Brenda Marles testified she even encouraged Rico Marles to go to WPB VAMC to get tested. SMF ¶ 5.  Brenda Marles (who spent the whole weekend with him) also testified that Rico Marles did not tell her, and she did not notice, him responding to visual hallucinations or auditory hallucinations. Brenda Marles also did not have any concerns he was suicidal. SMF ¶¶ 11-14.

In addition to his reported concern of having COVID-19, which was clearly a high priority issue during this January 2021 time period as reflected by the highest reported COVID-19 deaths during this time period, on January 15, Rico Marles also reported a host of serious, life-threatening symptoms which needed to be addressed by Dr. Pandit. Critically, Rico Marles denied suicidal intention to multiple providers at both visits. JF ¶¶ 8, 20, 21; SMF ¶¶ 19, 31. This is consistent

with the medical records from both visits, and testimony of Dr. Pandit regarding the fact that Rico Marles presented to the WPB VAMC on January 15, due to his reported concern of having COVID-19. Rico Marles himself stated this belief to his wife (JF ¶ 5) and his mother (JF ¶ 16). Furthermore, his complaints on both visits included *physical* symptoms, not just mental health symptoms that Plaintiff has focused on throughout discovery. It is undisputed that Rico Marles was concerned he had COVID-19 and his visits occurred during the height of the COVID-19 pandemic before widespread availability of vaccines.

It is undisputed that Dr. Pandit also inquired further of Rico Marles and his self-described "hallucinations like crazy dreams" and found them to be a non-issue based on additional questioning and her clinical observations. SMF ¶¶ 20-23. This is consistent with Brenda Marles's testimony that she did not witness any such behaviors by Rico Marles. SMF ¶¶ 8-11; JF ¶ 5. Plaintiff has nothing to prove otherwise. Instead, Dr. Louis, Plaintiff's emergency medicine expert, conceded Dr. Pandit did the psychiatric portion of her examination. SMF ¶ 43. Dr. Louis admitted that he does not know what other follow-up questions she might have asked about hallucinations or any other complaint during the visit. SMF ¶ 44.

When he returned to the ED on January 18, Rico Marles continued to complain of anxiety about COVID-19, and also complained about worsening chills and sore throat and unspecified body aches, which are all consistent with a viral infection. JF ¶¶ 19-24, 26. There is absolutely no indication in the notes from the January 18 visit that he complained of any additional or concerning mental health conditions aside from anxiety regarding COVID-19 (*Id.*), which at the time was a very serious, and potentially-fatal, virus.

It is undisputed that anxiety over potential COVID-19 was common during this time period and somatic symptoms of underlying anxiety frequently manifest themselves in the ED. SMF ¶ 40. After testing Rico Marles for COVID-19, Dr. Pandit also informed him about the walk-in mental health clinic at Unit 1C ("MHC"). SMF ¶¶ 35-36; 38-39. Dr. Louis, Plaintiff's expert,

agreed this referral by Dr. Pandit was proper.  SMF ¶ 70.  The MHC, which is down the hall from the ED at WPB VAMC, was still open when Rico Marles was discharged from the ED (SMF ¶¶ 4, 5), but he did not go to the MHC that day (SMF ¶ 30). Although Plaintiff criticizes and second guesses the care provided at the ED when she was also not present at either visit (SMF ¶ 16), Defendant contends it is also undisputed Rico Marles did not follow the care and guidance that was provided by either Dr. Pandit (to go to MHC, (SMF ¶¶ 24-27)) or Dr. Huber (to take prescribed lorazepam dispensed at the visit as directed) (SMF ¶ 37), since none was detectable in his system after his death. JF ¶ 28.

Other courts confronted with FTCA wrongful death by suicide by individuals outside of a custodial setting when treatment was for other medical complaints have resolved summary judgment in favor of the United States on the issue of foreseeability.  *See Stark v. United States*, 2020 WL 190711 at *7, *9 (E.D.N.C. Apr. 9, 2020) (applying North Carolina law in FTCA action to grant summary judgment for government as estate could not hold primary care provider liable when it only treated for pain management and not patient's depression, patient denied suicidal ideation, providers had never met the patient before, and had no ability to control patient, and patient was actively receiving treatment at different psychiatric care specialist); *Murillo v. United States*, 504 F. Supp. 3d 875, 890 (N.D. Ill. 2020) (applying Illinois law in FTCA action, granting government's motion for partial summary judgment on issue of proximate cause agreeing Young's suicide was not reasonably foreseeable as a likely consequence of the VA's actions, and that his suicide was intervening cause of his death and noted that Young denied suicidal ideation to last treating doctor, nor did he express any suicidal thoughts to his mother after his last treatment); *Dux v. United States*, 69 F. Supp. 3d 781, 789 (N.D. Ill. 2014) (applying Illinois law in FTCA action, granting government's motion for partial summary judgment on issue of proximate cause agreeing that as a matter of law suicide was not reasonably foreseeable as a likely consequence of the alleged breach and Dux's suicide was intervening case of his death). The Court should do the same here.

Any other mental health issues Rico Marles may have been experiencing that weekend that led him to commit suicide but were not disclosed to Dr. Pandit or Dr. Huber cannot be used to hold Defendant liable as the physicians had no opportunity to treat an undisclosed concern. Indeed, Florida law is clear that emergency room doctors "do not have a duty to treat each of their patients for every conceivable medical condition that they might have." *Garcia,* 754 So. 2d at 49. Dr. Louis, Plaintiff's emergency physician expert, agreed a physician can only do their best based on information provided by the patient. SMF ¶ 42. Thus, a suicide after two ED visits concerning fear of having COVID-19 is more like a freakish and improbable event than a reasonably foreseeable harm as a result of his two visits, especially when Rico Marles denied any suicidal intent. Therefore, Rico Marles's suicide 24 hours after discharge was not foreseeable as a matter of law given the emergent symptoms Rico Marles actually disclosed in the ED. The outpatient care provided on January 15 and January 18 in the ED met the standard of care applicable to emergency medicine physicians.

## CONCLUSION

Plaintiff is unable to establish as a matter of law the elements of medical negligence under Florida law and judgment in favor of Defendant is necessary.  First, Florida's Good Samaritan Act relieves Dr. Pandit and Dr. Huber, providers of emergency care, of civil liability in the absence of action or inaction showing a reckless disregard for the safety of Rico Marles beyond the negligence standard of care. Plaintiff has neither allegations in the Amended Complaint, nor any expert opinion establishing a reckless disregard, and therefore Plaintiff cannot meet her burden that the standard of care was breached. Second, even if the reckless disregard standard provided in the GSA does not apply in this case, Plaintiff cannot establish causation as a matter of law when the suicide rule applies and the suicide was not reasonably foreseeable as a matter of law given the treatment provided in the ED to Rico Marles on both January 15 and January 18.  Plaintiff's

theories of liability with the benefit of 20/20 hindsight all hinge on second guessing, sheer conjecture, and speculation, which are insufficient to defeat summary judgment.

Date: July 31, 2024

Respectfully submitted,

**MARKENZY LAPOINTE**
**UNITED STATES ATTORNEY**

By:    *Monica L. Haddad*
       MONICA L. HADDAD
       Assistant U.S. Attorney
       Florida Bar No. 99426
       Email: Monica.Haddad@usdoj.gov
       U.S. Attorney's Office
       Southern District of Florida
       500 S. Australian Avenue, Suite 400
       West Palm Beach, Florida 33401
       Telephone: (561) 209-1004
       Facsimile: (561) 820-8777

       MARY BETH RICKE
       Assistant U.S. Attorney
       Florida Bar No. 107213
       Email: Mary.Ricke@usdoj.gov
       U.S. Attorney's Office
       Southern District of Florida
       500 E. Broward Boulevard. Suite 700
       Ft. Lauderdale, Florida 33394
       Telephone: (954) 660-5749
       Facsimile: (954) 356-7336

       *Attorneys for Defendant, United States of America*