**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:23-cv-80911-AMC**

**BRENDA LEIGH MARLES**,
and **THE ESTATE OF RICO MARLES,**
Plaintiffs,

v.
**UNITED STATES OF AMERICA,**
Defendant.
_____________________________________/

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF FACTS

Rico Marles ("Rico") was a 29-year-old United States Marine Corps ("USMC") Veteran when he died by suicide on January 19, 2021, after he placed a loaded pistol underneath his chin, pulled the trigger and propelled a bullet through his brain. (D.E. 9, ¶9.) Rico entered active-duty service in the USMC on June 1, 2009, and was honorably discharged on August 30, 2018. During Rico's enlistment, he was deployed to Afghanistan twice as part of Operation Enduring Freedom. Statement of Material Facts "SMF" ¶48.

On December 20, 2017, Rico established his primary care with Dr. Gabriel Gemayel ("Dr. Gemayel") and reported a past medical history of PTSD and costochondritis. SMF ¶49. Rico reported he had been suffering from insomnia and was treated by Dr. Willingham for depression and PTSD since February 2016. *Id*. Dr. Gemayel assessed Rico as having PTSD with a diagnostic code of F43.10; anxiety and depression with a diagnostic code of F41.8; and primary insomnia with a diagnostic code of F51.01. *Id*. Dr. Gemayel continued Rico's prescriptions for Citalopram and Clonazepam, which had been prescribed for his anxiety and

depression. He also continued Rico's prescription for Trazadone HCI 50 mg., which had been prescribed for his primary insomnia. *Id*.

Rico saw Dr. Gemayel on January 17, 2018, and reported he was still suffering from insomnia, but the Trazadone helped. SMF ¶52. Rico reported he was still having depression, PTSD and panic attacks. *Id*. Dr. Gemayel increased Rico's Trazadone to 100mg and refilled his prescriptions for Citalopram and Clonazepam. *Id*.

Rico saw Dr. Gemayel on April 18, 2018, and reported the Trazadone was helping him sleep. SMF ¶54. Dr. Gemayel refilled Rico's prescriptions for Trazadone, Clonazepam and Citalopram. *Id*.

Rico saw Dr. Gemayel on August 13, 2018, for migraines and shin splits. SMF ¶56. He did not report any symptoms related to his PTSD, anxiety, depression, or insomnia. *Id*. Dr. Gemayel continued Rico's Trazadone prescription for his primary insomnia. *Id*. He also continued Rico's Citalopram prescription for his anxiety and depression. *Id*. Dr. Gemayel refilled Rico's Clonazepam prescription for his PTSD. *Id*.

On September 26, 2018, Rico was granted a 50 percent service connection disability rating for posttraumatic stress disorder and unspecified anxiety order (claimed as depression and insomnia) that was determined to be directly related to his military service. SMF ¶58.

On June 11, 2019, Rico's 50 percent service connection disability rating for his posttraumatic stress disorder (PTSD) with unspecified depressive, anxiety and panic disorder was continued. SMF ¶59.

On August 9, 2019, Rico had an encounter with Clinical Nurse Specialist, Elise Shalloway and informed her he had been diagnosed with PTSD and was taking trazadone, Celexa and Buspar for about 2 years. SMF ¶60. He stated that during the past week his

depression and anxiety had increased, and his sleep was poor. *Id*. Rico believed this was most likely due to being without medication for the past few weeks. *Id*. Ms. Shalloway ordered trazadone, Celexa and buspar for Rico. *Id*.

On August 26, 2019, Rico called the VA National Suicide Prevention Hotline and spoke with Bobby Acoff. The call started at 11:32 a.m. and ended at 12:20 p.m. SMF ¶61. Rico called because of his suicidal thoughts, mental health illness and PTSD symptoms. *Id*. During the call Rico stated he had been having thoughts of suicide for the past few months. *Id*. He reported he had been struggling physical and mentally after getting out of the Marines. *Id*. He was feeling increased anxiety, chest pains and could not find himself. He explained he had gone to the ER the day before for his chest pains and was told it was due to stress. *Id*. After speaking with Bobby Acoff, Rico told Jessica Diaz, Suicide Prevention Coordinator at the WPB VAMC, that he was "good, now" and trying to re-engage with mental health services. SMF ¶62.

On November 17, 2020, Rico informed Jennifer Dyer, a LCSW (licensed clinical social worker) at the WPB VAMC that he was having extreme emotions or mood swings and his current/past mental health history included PTSD, depression, anxiety, insomnia and nightmares. SMF ¶63. Ms. Dyer performed a PHQ-2 depression screen on Rico, and it was positive for depression. SMF ¶64. Rico explained that nearly every day during the past two weeks he had little interested in doing things and, more than half the days, he was feeling down, depressed, or hopeless. *Id*.

Ms. Dyer performed a PHQ-9 depression analysis on Rico and he received a score of 20 which indicates he had severe depression. SMF ¶65. Rico explained that nearly every day he had little interest or pleasure in doing things, had trouble staying asleep, felt tired or had little energy, felt bad about himself, was a failure and had trouble concentrating on things. *Id*. Rico

reported that more than half the days he felt down, depressed, or hopeless. *Id*. Rico further reported these problems made it extremely difficult for him to do his work, take care of things at home or get along with other people. *Id*.

Rico informed Ms. Dyer he had chronic pain. SMF ¶66. It was caused by his costochondritis and primarily located in his chest and radiated to his shoulders. *Id*. Rico explained he just wanted the pain to go away. *Id*.

On January 14, 2021, Rico sent a text message to his mother, Vicki Marles, which states: "Yeah. I just feel like im isolated[.] We haven't been able to do much[.]" SMF ¶67.

On January 14, 2021, Rico sent a text to his mother which states: "Trying to hold it together mom[.]" SMF ¶68. "Seriously mom I have been having dreams of being paralyzed and possessed[.]" *Id.* Can I tell you something that's hurting me? Mario tried to rape me when I was a kid[.] " That's why I wanted to run away[.] *Id.* "I been dealing with it lately." *Id.* Rico's mom explained this was a "trigger" to "[e]motions and dreams[.] *Id.* " Rico responded: "I almost thought Brenda was doing something but I can see she really trying to help me[.] I think [m]y mind messed up[.]" *Id.*

On January 15, 2021, Rico sent a text to his mother and agreed he had "anxiety with a panic disorder" SMF ¶69. "I feel manipulated[.] That's my main problem[.]" SMF ¶13. I know I'm dealing with my childhood but I feel manipulated[.] *Id*. Rico's mother asked him: "Y do u feel manipulated[?]" *Id*. Rico responded: "Well I think the dreams and stuff [.]That's why I been tripping[.] I be paralyzed in my dreams[.] I think it's really my head tripping[.] And without outside help just talking it over with Brenda not working for me[.] But she good[.] She don't believe nothing physical wrong with me[.] But she do believe I have anxiety[.]" *Id*. Rico mother's responded: "Rico I think proper counseling a meds u will be fine[.] *Id*.

On January 16, 2021, Rico sent a text to his mother which states: and explained "I think the isolation really getting to me[.]" SMF ¶70. "I need help mom[.] What do I do[?] *Id*. On January 18, 2021, at 7:16 a.m. Rico's mother responded: "Make an appointment at VA speak to a licensed psychologist being able to express things really helps to unclouding ur thoughts[.] *Id*.

On January 19, 2021, Brenda was interviewed by Chad Shane from the Palm Beach County Sheriff's office. She told Mr. Shane that she and Rico were best friends and he had just recently begun expressing that he was experiencing PTSD from deployments to Iraq and Afghanistan while an active-duty marine. SMF ¶12.

Rico felt that watching the riots at the Capital on the television, as well as being in isolation due to Covid, was beginning to cause him to feel depressed and experience anxiety. Rico explained he had not been sleeping well, so he would sleep next to Brenda on the floor because it resembled the firmness of the cots he slept on during deployment. SMF ¶14.

Brenda encouraged Rico to use his resources from the Veterans Affairs, but he felt they were not helpful. Brenda and Rico talked about a plan going forward of returning to the Veteran Affairs as many times as they deemed necessary to get the appropriate help for Rico. Brenda told Rico she would go with him and provide support as they were a team. SMF ¶14.

On October 18, 2021, Brenda attended an Adverse Events Institutional Disclosure meeting with various representatives from the WPB VAMC including, Dr. Ronald Williams, Chief of Staff, and Dr. Melanie Perez, Chief of Psychology. Brenda's mother, Yvette Fort, a licensed clinical social worker, was also present during the meeting.

During the meeting, Dr. Williams told Brenda:

> We are here to apologize and say we did something wrong. We have found areas of opportunity that we will definitely be changing for the sacrifice that your husband did both in combat and here in the combat of healing which we failed him too. It's horrible, horrible, horrible, horrible, and I'm sorry you're going through this pain and this is why

> we are here to say we are sorry. We are not going to justify. It does not matter. We did something wrong. [Rico] left this building, and we did not surround him with the care to protect him . . . It's horrible and I am not going to wishy-wash it for you anymore. We have experts who have said we could have done something different and there's no doubt about that. (Ex. 10, Transcript 24:17-25:10.)

## LEGAL ARGUMENT

### A. Defendant is Not Entitled to the Immunity Provided by Florida's Good Samaritan Act.

Defendant contends it is "immune" from liability pursuant to Florida's Good Samaritan Act ("GSA") Fla. Stat. § 768.13(2)(b) because Plaintiffs have not offered any expert testimony that Dr. Pandit and Dr. Huber acted with "reckless disregard" when they treated Rico on January 15 and 18, 2021. Specifically, Defendant contends it is immune from liability based on the GSA's reference to 42 U.S.C § 13955dd, the "Emergency Medical Treatment and Labor Act" ("EMTALA). "The threshold question in determining the applicability of the Good Samaritan Act is whether the healthcare provider was providing 'emergency services' to the patient." *Cantore v. West Boca Medical Center, Inc.,* 254 So.3d 256, 260 n. 2 (2018).

Fla. Std. Jury Instr. (Civ.) 402.16(a) sets forth the definition of emergency medical services applicable to Fla. Stat. § 768.13(2)(b) and states:

> The first issue for you to decide on (claimant's) claim against (defendant) is whether (claimant) was being [cared for] [treated] under emergency circumstances.
>
> [Care] [treatment] is rendered under emergency circumstances when a [physician] renders medical [care] [treatment] required by a sudden, unexpected situation or event that resulted in a serious medical condition demanding immediate medical attention, for which (claimant or decedent) initially entered the hospital through its [emergency room] before (claimant or decedent) was medically stabilized and capable of receiving [care] [treatment] as a nonemergency patient.

Defendant has made no factual showing that when Rico presented to the WPB VAMC on January 15 or 18, 2021, he needed medical care or treatment required by a sudden, unexpected situation or event that resulted in a serious medical condition and demanded immediate medical

attention. In fact, when Rico presented to the WPB VAMC ED on January 18, 2021, Juan Rivera, R.N. was the triage nurse who obtained information from Rico regarding his chief complaint so he could be assigned a proper priority on the Emergency Severity Index ("ESI") scale. SMF ¶71.

The ESI scale goes from one to four with one being the highest level of severity and four being the lowest level of severity. Examples of an ESI four include someone running out of medication with no symptoms, a superficial cut that needs a tetanus shot, or an isolated rash on the skin. SMF ¶72.

After conducting Rico's triage assessment, Mr. Rivera gave Rico an ESI score of four, the lowest level of severity, because he was presenting with flu-like symptoms, not because he needed medical care or treatment required by a sudden, unexpected situation or event that resulted in a serious medical condition and demanded immediate medical attention. SMF ¶73. Based on Rico's ESI rating of four, this Court should rule that, as a matter of law, Florida's GSA does not apply to this case and deny Defendant's request for summary judgment on this issue.

In addition, given Defendant's contention it is immune from liability based on the GSA's reference to 42 U.S.C § 1395dd, a further threshold issue is whether Defendant can establish Rico had an "emergency medical condition" as defined by 42 U.S.C § 1395dd(e)(1).

42 U.S.C. §1395dd(e)(1) defines "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part.

Under this definition, a patient who suffers from an "emergency medical condition" is in imminent danger of death or serious disability. *Thornton v. Southwest Detroit Hosp*. 895 F.2d

1131, 1134 (6th Cir. 1990.) In this case, Defendant has produced no evidence or expert testimony that Rico was in imminent danger of death or serious disability when he was evaluated on January 15 or 18, 2021. In fact, as set forth above, when Rico presented to the WPB VAMC on January 18, 2021, he was given an ESI rating of four because he was only presenting with flu like symptoms. SMF ¶73. Based on Rico's ESI rating of four, and Defendant's failure to produce any evidence or expert testimony that Rico was in imminent danger of death or serious disability, this Court should rule, as a matter of law, that EMTALA does not apply to this case and deny Defendant's request for summary judgment on this issue.

Defendant argues Rico's "treatment" on January 15 and 18 qualifies as "emergency services" under the GSA because he expressed symptoms related to life-threatening conditions, such as cardiac or pulmonary issues and "concerns" related to COVID-19. (D.E. 55, p. 10.) However, Rico did not present with these symptoms on January 18, 2021, and by that time his Covid, cardiac and pulmonary issues has been ruled out. In addition, EMTALA requires that the patient present to the ED with "*acute symptoms of sufficient severity* (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual . . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." 42 U.S.C. §1395dd(e)(1) [Emphasis added.]. Defendant does not provide any evidence or expert testimony that on January 15 or 18, 2021, Rico had *"acute symptoms of sufficient severity"* to prove Rico was in "imminent danger of death or serious disability. *Thornton, supra,* at 1134. As such, as a matter of law, the GSA does not apply to the circumstances of this case.

Further, even if the Court finds it cannot rule the Good Samaritan Act is inapplicable to Defendant's MSJ, the issue of whether a particular patient was stabilized requires this Court to

make a "resolution of factual disputes" that would preclude granting Defendant's request for summary judgment on this issue. *University of Florida Bd. of Trustees v. Stone ex rel. Stone*, App. 1 Dist., 92 So.3d 264, 270 (2012). If Defendant intends to pursue this affirmative defense, whether Rico presented with acute symptoms of sufficient severity such that he was in imminent danger of death or serious disability is a trial question of fact.

Even assuming the Court believes there are triable issues of fact regarding whether Rico was in imminent danger of death or serious disability when he presented to the ED on January 15 or 18, 2021, the GSA still does not apply because Rico did not die from any of the conditions associated with the January 15 or 18 ED visit. The plain language of the GSA applies to medical care occurring *prior to the time* the patient is stabilized and can receive medical treatment as a nonemergency patient. "This language describes the scope of the immunity provided by section 768.13(2)(b) 1., and in doing so, it provides a *temporal limitation* on the 'emergency services' that are subject to immunity." *University of Florida Bd. of Trustees v. Stone ex rel. Stone*, *supra,* at 269-270. It is undisputed Rico did not die from complications related to any of the medical conditions he presented with "prior to the time" he was "stabilized." Instead, he died from a gunshot to his head, which Plaintiffs contend was caused by Defendant's negligence. As such, this Court should rule that, as a matter of law, Florida's GSA does not apply to this case and deny Defendant's request for summary judgment on this issue.

**B. There is a Triable Issue of Fact Regarding Whether Dr. Pandit and Dr. Huber Breached the Standard of Care They Owed to Rico.**

Defendant contends Plaintiff cannot establish medical negligence as a matter of law because Dr. Pandit and Dr. Huber had *no duty to prevent suicide* in an outpatient setting. (D.E. 55, p. 11). Defendant argues "Plaintiff is unable to establish a duty was owed by the WPB VAMC providers *to prevent the suicide* that occurred at Rico Marles's home." (D.E. 55, p. 12).

Defendant reiterates that "Plaintiff is unable to establish that Defendant had a *duty to prevent Rico Marles's suicide* which occurred at his home when he was outside the custody and control of Defendant." (D.E. 55, p.14). However, this is a mischaracterization of the duty owed to Rico. Plaintiff has never argued that Dr. Pandit and Dr. Huber had a *duty to prevent* Rico's suicide. Instead, she alleges these providers breached the *duty of care* they owed to Rico. (D.E. 9 ¶54.)

The critical distinction between a medical provider's duty to prevent suicide and their legal duty of care was carefully analyzed in *Granicz v. Chirillo* 147 Sp.3d 544 (Fla. 2nd DCA 2014). *Granciz* involved the "tragic suicide" of Jacqueline Granicz, a 55-year-old mother and wife who had been treated by her primary care physician, Dr. Joseph Chirillo for depression. Like Rico, Jacqueline was being treated as an *outpatient* and not at an inpatient psychiatric facility.

Jacqueline's husband filed a wrongful death action against Dr. Chirillo and alleged he breached his duty to use reasonable care in his treatment of Jacqueline. *Id*. at 546. Defendant subsequently filed a motion for summary judgment and argued Dr. Chirillo "had no duty to prevent Jacqueline from committing an unforeseeable suicide while not in his control." *Id.* at 547.

Plaintiff argued summary judgment was improper because Dr. Chirillo "had a duty to exercise reasonable care in his treatment of Jacqueline and "because he provided expert testimony setting forth the standard of care, how it was breached, and how the breach proximately caused Jacqueline's suicide." *Id.* at 546." Nonetheless, the trial court granted Defendant's motion "based on its finding that, as a matter of law, Dr. Chirillo did not owe a duty to prevent the unforeseeable suicide of an outpatient." *Id.* at 547. On appeal, Plaintiff argued the trial court "improperly characterized Dr. Chirillo's duty as a duty to prevent Jacqueline's

suicide." *Id* at 546. The Court of Appeal unanimously agreed and reversed the trial court's decision.

In *Granicz, supra*, the Court explained the prevailing standard of care for a physician is "'that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers'" (citations omitted). *Id.* at 584. The Court further recognized that the specific aspects of this duty depends partially on the extent or duration of the provider/patient relationship and "a relationship of only a short duration" *might not* be sufficient for the provider to have a duty to provide appropriate psychiatric treatment." *Id.* at 548 fn.2. citing *Perez v. United States*, 883 F.Supp.2d 1257, 1297.[1]

In *Granicz, supra*, Defendant did not provide any expert testimony that Dr. Chirillo complied with the standard of care. Instead, he argued as a matter of law that he had no duty to prevent Jacqueline's suicide. However, Plaintiff provided expert testimony regarding the standard of care which was sufficient to establish that Dr. Chirillo owed a legal duty to Jacqueline that preclude summary Judgment. *Id* at 548, 549. [2] As such, the *Granicz* Court

---

[1] In *Perez, supra,* following a bench trial, the District Court Judge, held that a VA psychiatrist breached his duty to make a proper diagnosis and to conduct regular evaluations of the patient's mental status; the psychiatrist's breach proximately caused the patient's suicide; and the daughter could recover damages. *Id*. at 1257. The Court explained that "a treating relationship of only a short time period, or treatment for a medical issue without any obvious psychiatric aspects, may not be sufficiently developed such that the health care provider is able to gain adequate insight as to the patient and, consequently, the provider may not necessarily be liable for failing to provider appropriate psychiatric treatment and care." *Id.* at 1299. However, in this case, Plaintiff has never argued that Dr. Pandit and Dr. Hubert had a duty to provide Rico with psychiatric treatment and care. Instead, Plaintiff argues these physicians had a duty to refer Rico to a qualified mental health provider so he could obtain appropriate mental health care. (D.E. 9, ¶54)

[2] In this case, Defendant has produced no expert testimony that Dr. Pandit and Dr. Huber complied with the standard of care. However, Defendant has included the FRCP 26 reports of

concluded "the expert testimony established that Dr. Chirillo had a duty to treat Jacqueline in accordance with the prevailing standard of care for a primary care physician treating a patient for depression, precluding summary judgment on this issue." *Id.* at 549.

Dr. Chirillo appealed the *Granicz* Court's decision to the Florida Supreme Court, and it issued a unanimous decision that the District Court of Appeal "properly evaluated the case based on the statutory duty owed to the decedent." *Chirillo v. Granicz,* 199 So.3d. 246 (2016). The Supreme Court recognized the inpatient duty to prevent suicide did not apply in *Granicz,* but "there still existed a statutory duty under Fla. Stat. 766.102 to treat the decedent in accordance with the standard of care." *Id.* 251. The Court further found that the Second District "properly evaluated the instant case based on the statutory duty owed the decedent." *Id* at 251.

There can be no question that as a matter of law, Dr. Pandit and Dr. Huber owed Rico a duty to utilize the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers. Defendant's mischaracterization of this duty as a "duty to prevent suicide" cannot provide a basis for summary judgment.

**C. There is a Triable Issue of Fact Regarding Whether Dr. Pandit's and Dr. Huber's Breach of the Standard of Care Was a Proximate Cause of Rico's Suicide.**

Suicide prevention is the VA's number one clinical priority. Because the VA's goal is zero suicides, it has created numerous initiatives to prevent suicide. SMF ¶77. By establishing suicide prevention as its number one clinical priority and creating numerous initiatives to reach

---

Plaintiff's two emergency room physicians, Dr. Louis and Dr. Zun, which establish Dr. Pandit and Dr. Huber breach the legal standard of care they owed to Rico. (D.E. 54 ¶ 41.) In addition, with this opposition, Plaintiff has submitted the rebuttal reports of Dr. Louis and Dr. Zun which further establish Dr. Pandit and Dr. Huber breached the legal standard of care they owed to Rico.

its goal of zero suicides, the VA recognizes that suicide is not only foreseeable, but with proper mental health care it can be prevented.

The issue of proximate cause asks, "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *McCain v. Florida Power Corp.* 593 So.2d 500, 502 (Fla. 1992). The foreseeability of a "decedent's suicide is a matter of fact for the jury to decide in determining proximate cause." *Chrillo, supra,* at 252.

Defendant cites *Timson v. Juv & Jail Facility Mgmt. Servs. Inc.,* No. 8:07-CV-1297-T-MAP, 2009 WL 10671134, at *7-9 (MD Fla. Apr 24, 2009) , affd, 355 F. App'x 283 (11th Cir. 2009) for the proposition that "reasonable minds cannot differ when the act of suicide was a superseding and intervening cause." (D.E. 55, p. 16). However, *Timson,* is distinguishable from the facts of this case. In *Timson,* there was no information reasonably available to the jail officials that the inmate might harm himself such as "knowledge of any mental health issues." *Id*. at *2.

In this case, during her tenure at the WPB VAMC, Dr. Pandit had annual Veteran suicide training and knew it was important because "it's someone's life." SMF ¶74. Dr. Pandit knew Rico had mental health issues. Rico told Dr. Pandit he had PTSD which she knew it was a risk factor for suicide. SMF ¶75. Rico told Dr. Pandit he had anxiety which she knew was risk factor for suicide. SMF ¶76. In fact, Dr. Pandit diagnosed Rico with anxiety. As such, Defendant's reliance on *Timson, supra,* is misplaced.

Defendant repeatedly argues that Rico's "primary concern on January 15 and January 18 revolved around his belief that he had contacted COVID-19 and was experiencing symptoms." (D.E. 55, p.17). However, his medical records prove otherwise. Rico had multiple mental health

issues including PTSD, anxiety, insomnia, crazy dreams, hallucinations, and financial stress from trying to start a new business.

The undisputed evidence before this court establishes that in January 2021, Rico was mentally decompensating and needed help from a qualified mental health professional. Rico's text exchanges with his mother between January 14 and 18, show he was trying to "hold it together," but his mind was "messed up" because he was having dreams of being "paralyzed and possessed" and "hurting" because he was remembering that his cousin Mario tried to rape him when he was a kid. SMF ¶68.

On January 15, 2021, Rico explained to his mom that he had "anxiety with a panic disorder," SMF ¶69 was "tripping," and felt "manipulated" by his "dreams." Rico's mom recognized that he needed "proper counselling" and "meds." On January 16, 2021, Rico told his mom that the "isolation was really getting to" him and he needed help. When Rico asked his mother "what do I do," she responded he should make an appointment at the VA to speak with a "licensed psychologist" because being able to express things would help to uncloud his thoughts. SMF ¶70.

Brenda also knew that in January 2021 Rico needed help because he was experiencing depression, anxiety and not sleeping well. Within hours of Rico's death, she was interviewed by Chad Shane from the Palm Beach County Sheriff's office and explained Rico had just recently begun expressing that he was experiencing PTSD from deployments to Iraq and Afghanistan while an active-duty marine. Rico felt that watching the riots at the Capital on the television, as well as being in isolation due to Covid, was beginning to cause him to feel depressed and experience anxiety. Rico explained he had not been sleeping well, so he would sleep next to

Brenda on the floor because it resembled the firmness of the cots he slept on during deployment. SMF ¶14.

Brenda encouraged Rico to use his resources at the Veterans Affairs, but he did not believe they were helpful. Brenda and Rico talked about returning to the Veteran Affairs as many times as necessary to get appropriate help for Rico. Brenda told Rico she would go with him and provide support as they were a team. Unfortunately, that plan was never carried out because Rico shot himself in the head. SMF ¶14.

Defendant contends there were intervening actions that broke the causal chain including Rico's "failure to follow medical advice when he did not go to the MCH on January 15, or take the medication prescribed on January 18." However, it is pure speculation that Rico could have been seen at the MCH on January 15 and it is undisputed it was closed on January 18. Dr. Pandit believed the MCH was open until 4:00 p.m. on January 15. SMF ¶5. She testified that *sometimes* a Veteran could be seen on the same day *or* later in the week. SMF ¶24. Defendant has produced no evidence regarding the MHC's patient census on January 15 or whether a qualified mental health provider was available to evaluate Rico on that day.

Defendant has not produced any evidence that the low dose of Lorazepam prescribed on January 18 would have prevented Rico's suicide, and it has not designated any FRCP 26 expert to testify regarding this causation opinion. It is undisputed Lorazepam was not the medication previously prescribed for Rico's insomnia, anxiety, depression, or PTSD. In fact, Rico was previously prescribed 100 mg of Trazadone for his insomnia and Citalopram and Clonazepam were prescribed to treat his other mental health conditions. SMF ¶53.

Defendant recognizes that in the absence of "a freakish and improbable chain of events" leading to injury, "the question of foreseeability as it relates to proximate cause generally must

be left to the factfinder to resolve." *McCain, supra,* at 503-504. (D.E. 55, p. 17.) However, it defies logic to argue that a "freakish and improbable chain of events" leading to injury exists when a USMC Veteran is mentally decompensating, and he is not properly evaluated by a qualified mental health provider. This argument is inconsistent with the VA's goal of zero suicide and establishing suicide prevention as its number one clinical priority. SMF ¶77. In any event, this is a question of fact for this Court to decide based on the testimony of properly designated FRCP 26 expert witnesses.

In this case, Defendant has not designated any expert witnesses to testify regarding the issue of causation. (D.E. 51-4.) However, Plaintiff has designated Dr. Zun and Dr. Bruce to fully address the issue of causation and this Court must be able to assess the competency of their testimony with respect to their causation opinions.

In *Draughon v. United States,* 2017 WL 3492313 (2017), District Court Judge, Julie Robinson, denied the USA's Motion for Summary Judgment and Motion to exclude Plaintiff's causation expert, Dr. Steven Bruce, from testify regarding causation. *Draughon* was a wrongful death claim brought pursuant to the Federal Tort Claims Act. Plaintiff alleged the Veterans Health Administration negligently treated Veteran William Draughon's PTSD and other mental health issues which ultimately led to his suicide. *Id.* at *1. Judge Robinson found that Dr. Bruce, a licensed psychologist, was qualified to render opinions regarding causation. Dr. Bruce expressed the "strong opinion" that if the William proper treatment at the VA "it would have changed the course and outcome of his life." *Id*. at *6. Dr. Bruce testified the VA's errors "were significant factors that contributed to [William's] suicide." *Id.*

In *Draughon*, as in this case, the USA argued there was insufficient evidence of causation because the circumstances of William's suicide were "too attenuated from the alleged breaches

of the duty of care by time, intervening events, and a lack of notice and foreseeability." *Id.* at *21. Judge Robinson disagreed and denied Defendant's Motion for Summary Judgment and Motion to Exclude. *Id.* at *22. The case then proceeded to a bench trial and resulted in a verdict on behalf of Plaintiff. *Draughon v. United States*, 309 F.Supp.3d 934 (2018) During the bench trial, Judge Robinson gave "great weight" to Dr. Bruce's "testimony of causation, which was powerful." *Draughon,* 309. F.Supp.3d at 957. *Draughon* is not the only FTCA case where the USA was found liable for a Veteran's suicide. In *Perez, supra,* William Hoeveler, Senior District Court Judge for the Southern District of Florida, found that a VA psychiatrist's breach in the standard of care proximately caused the Veteran's suicide and awarded damages to the Plaintiff.

## **CONCLUSION**

For the foregoing reasons, and as supported in Plaintiffs' concurrently filed documents, Plaintiffs respectfully request this Court deny defendant's motion for summary judgment in its entirety.

August 14, 2024

Respectfully submitted,
BENDER & ROBB, PLLC

By: */s/ Katherine S. Bender*

Katherine S. Bender, Esq.
FL Bar No.: 0123334
9100 S. Dadeland Boulevard
Suite 1500
Miami, FL 33156
(305) 701-4270 Telephone
(786) 431-2597 Facsimile
kat@benderrobb.com

August 14, 2024

BERTLING LAW GROUP

By: */s/ Peter G. Bertling*

Peter G. Bertling
CA Bar No. 131602
21 East Canon Perdido Street
Suite 204B
Santa Barbara, CA 93101
(805) 452-8305 Telephone
(805) 869-1597 Facsimile
peter@bertlinglawgroup.com
*Admitted Pro Hac Vice*
Attorneys for PLAINTIFFS