UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  23-cv-80911-CANNON/REINHART

BRENDA LEIGH MARLES, et al.,

                Plaintiffs,

vs.

UNITED STATES OF AMERICA,

                Defendant.

_____/

**OMNIBUS REPORT AND RECOMMENDATION [ECF Nos. 48, 51, 52. 55]**

      Rico Marles, a United States Marine Corps Veteran, committed suicide on January 19, 2021. His wife, Brenda Marles, individually and in her capacity as the Estate Representative for Mr. Marles, brings a wrongful death claim under the Federal Tort Claims Act ("FTCA") and Florida's Wrongful Death statute.[1] ECF No. 9. Mrs. Marles says that Mr. Marles' death "could have been prevented if he received treatment at the West Palm Beach Veterans Affairs Medical Center ("VA") that complied with the standard of care." *Id.*

      The Government moves to partially dismiss Mrs. Marles' claim under the discretionary function exception to the Federal Tort Claims Act. ECF No. 48. The

---

[1] Mrs. Marles initially brought two claims, one for wrongful death and another for negligent infliction of emotional distress. ECF No. 9. Judge Cannon has since dismissed the negligent infliction of emotional distress claim. ECF No. 47.

Government says Mrs. Marles did not exhaust her administrative remedies "for her theories relating to the VA's in-house electronic health record system." *Id.* Mrs. Marles concedes. ECF No. 60. So, I **RECOMMEND** that the Government's Partial Motion to Dismiss be **GRANTED** by stipulation of the parties. ECF Nos. 60, 64.

 On the remaining claims, the Government moves for judgment as a matter of law under the heightened standard of Florida's Good Samaritan Act. ECF No. 55. The Government says Mrs. Marles has not established "reckless disregard" as a matter of law. *Id.* at pp 4. Alternatively, the Government argues, if the Court decides not to apply the heightened standard, Mrs. Marles still cannot establish the duty or causation elements of medical negligence as a matter of law because the suicide was an "independent and intervening act" that happened outside of the VA's custody and control. *Id.*

The parties have also filed cross-*Daubert* motions. ECF Nos. 51–52. I have reviewed all the relevant pleadings and for the reasons stated below, I **RECOMMEND** the Government's Motion for Summary Judgment be **GRANTED** and the cross *Daubert* Motions be **DENIED AS MOOT**.

## I.     LEGAL PRINCIPLES

1. <u>Summary Judgment</u>

The legal standard on cross-motions for summary judgment does not differ from the standard applied when only one party files a summary judgment motion.

*See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

That standard is well-settled:

> Summary judgment is authorized only when, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *See Adickes*, 398 U.S. at 157.

> The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

*Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693JB v. Capri of Palm Beach, Inc.,* 932 F. Supp. 1444, 1446 (S.D. Fla. 1996), *aff'd sub nom. Certain Underwriters v. Capri,* 128 F.3d 732 (11th Cir. 1997).

> The moving party's burden on a motion for summary judgment "depend[s] on whether the legal issues ... are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (emphasis in original) (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d 1428, 1437 (11th Cir.

1991)). "For issues, however, on which the non-movant would bear the burden of proof at trial, 'the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility.'" *Id.* (emphasis in original) (quoting *Four Parcels*, 941 F.2d at 1437–38).

*Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2561364, at *1 (S.D. Fla. May 20, 2020). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Federal Rule of Civil Procedure 56 and Local Rule 56.1 mandate the procedure for pleading (and responding to) a Motion for Summary Judgment. Rule 56(c)(1) states:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Our Local Rule requires even greater specificity. Each asserted or disputed fact must be "supported by specific, pinpoint references" to particular parts of the record. S.D. Fla. L.R. 56.1(b)(1)(B), (b)(2)(A). "The pinpoint citations shall reference pages and line numbers, if appropriate, of exhibits, designate the number and title of each exhibit, and provide the ECF number of all previously filed materials used to support the Statement of Material Facts. When a material fact requires specific evidentiary support, a general citation to an exhibit without a page number or pincite (e.g., 'Smith Affidavit' or 'Jones Deposition' or 'Exhibit A') is non-compliant." S.D. Fla. L.R. 56(b)(1)(B). The Court has discretion to disregard a factual assertion or dispute that is not properly supported. Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d). The Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or
(4) issue any other appropriate order.

5

Fed. R. Civ. P. 56(e). A factual assertion that is not properly disputed may be deemed admitted "provided that: (i) the Court finds that the material fact is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. Fla. L.R. 56.1(c).

Against this framework, for the purpose of discerning the undisputed material facts, to the extent a party has acknowledged that the opposing party's fact is "undisputed," the fact will be treated as undisputed for purposes of the pending motions. Where appropriate, I have reviewed the cited material to clarify the undisputed fact, for example, by identifying a date or the precise wording of a document. Where a party asserts a fact is disputed, I have reviewed the record citation to determine if it creates a genuine dispute.

In their Responses to the Statements of Undisputed Material Fact, the parties occasionally assert additional facts to clarify, limit, or contextualize the other side's proposed facts. These additional facts (even if supported by evidentiary citations) do not contradict or "genuinely dispute" the proposed fact. *See* Fed. R. Civ. P. 56(c)(1); *see also* S.D. Fla. L.R. 56.1(a)(2) (Opposition to Statement of Material Facts "shall clearly challenge any purportedly material fact asserted by the movant that the opponent contends is genuinely in dispute."). Nevertheless, if the additional facts are material and supported by evidence in the record, I consider them.

   2.  Federal Tort Claims Act

"The FTCA is a specific, congressional exception" to the United States' sovereign immunity for tort claims, under which the government may "be sued by

certain parties under certain circumstances for particular tortious acts committed by employees of the government." *Suarez v. United States*, 22 F.3d 1064, 1065 (11th Cir.1994).

Under the FTCA, the United States is liable for tortious conduct "in the same manner and to the same extent as a private individual under like circumstances" after applying the applicable law in the same jurisdiction. 28 U.S.C. § 2674. The Supreme Court has instructed that the words 'like circumstances' "do not restrict a court's inquiry to the same circumstances but require it to look further afield." *United States v. Olso*n, 546 U.S. 43, 46, (2005) (citation omitted). The Eleventh Circuit has interpreted the "like circumstances" requirement to be "analogized to a similarly situated private party." *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1203 (11th Cir. 2008).

Florida law applies here because the actions alleged occurred in Florida. 28 U.S.C. § 1346. So, whether the West Palm Beach VA is liable depends on whether a similarly situated private hospital would be liable for those injuries under Florida law. *Turner*, 514 F.3d at 1203.

3. <u>Wrongful Death</u>

Under Florida law, to establish a cause of action for negligence in a wrongful death action, a plaintiff must show (1) the existence of a legal duty owed to the decedent, (2) a breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages." *Jenkins v. W.L. Roberts, Inc.,* 851 So. 2d 781, 783 (Fla. 1st DCA 2003).

When a plaintiff's claims are based on theories of medical malpractice, the Plaintiff must establish "the standard of care owed by the defendant, the defendant's breach of the standard of care, and proximate causation between the breach and the damages claimed." *Whittaker v. Sanchez*, No. 19-cv-13486, 2021 WL 4495808, at *3 (11th Cir. Oct. 1, 2021) (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)). 'The existence of a medical injury does not create any inference or presumption of negligence against a health care provider, and the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider." Fla. Stat. 766.102(3)(b). Florida defines the standard of care as:

> The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

Fla. Stat. 766.102(1), "In medical malpractice cases, the standard of care is determined by a consideration of expert testimony." *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995)); Fla. Stat. 766.102(1).

If a defendant relies on the Good Samaritan Act, the plaintiff must establish that the defendant acted with "reckless disregard" for the consequences of his or her actions. Fla. Stat. § 768.13(2)(b). According to the Good Samaritan Act,

> Any hospital licensed under chapter 395, any employee of such hospital working in a clinical area within the facility and providing patient care, and any person licensed to practice medicine who in good faith renders medical care or treatment necessitated by a sudden, unexpected situation or occurrence resulting in a serious medical condition demanding immediate medical attention, for which the patient enters

8

the hospital through its emergency room or trauma center, shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failing to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another

*Id.* "[R]eckless disregard" is defined as "conduct that a health care provider knew or should have known, at the time such services were rendered, created an unreasonable risk of injury so as to affect the life or health of another, and such risk was substantially greater than that which is necessary to make the conduct negligent." Fla. Stat. 768.13(2)(b). The immunity provided in the Good Samaritan Act applies to damages as a result of "any act or omission of provided medical care or treatment including diagnosis [] which occurs prior to the time the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient." Fla. Stat. 768.13(2)a. 'Emergency services and care' begin "when a physician undertakes a medical screening, examination, or evaluation to determine whether an emergency medical condition exists." *Cespedes v. Yellow Transp., Inc. (URC) / Gallagher Bassett Services, Inc.,* 130 So. 3d 243, 251 (Fla. 1st DCA 2013).

"If a defendant shows that a plaintiff is unable to present evidence of the negligence that he or she alleges in his or her complaint, then no genuine issue of material fact exists, and summary judgment may be granted in favor of the defendant." *Sims v. Helms*, 345 So. 2d 721, 724 (Fla. 1977). Likewise, "[w]here a plaintiff in a medical negligence action does not establish what standard of care existed under the circumstances of the case, and therefore is unable to show a breach

of such care, a directed verdict is appropriate." *Cagle v. United States,* 738 F. App'x

633, 638 (11th Cir. 2018) (*quoting Stepien v. Bay Mem'l Med. Ctr.,* 397 So. 2d 333, 334

(Fla. 1st DCA 1981).

## II.    MATERIAL FACTS

Mr. Marles served in the United States Marine Corps from June 2009 through

August 2018. Plaintiff Additional Facts ¶48. Mr. Marles was honorably discharged

and granted a 50 percent service-connection disability for Post Traumatic Stress

Disorder ("PTSD"). *Id.* at ¶58. Since his discharge, he visited the West Palm Beach

VA for medical assistance approximately six times. ECF No. 50-3. His last visit was

the day before he committed suicide. ECF No. 50-2 The visit before that was

approximately four days before he committed suicide. *Id.*

On August 9, 2019, Mr. Marles visited the VA and met with Clinical Nurse

Specialist, Elise Shalloway. ECF No. 57-19 at pp 2. Mr. Marles told Nurse Shalloway

that he had been diagnosed with PTSD and was taking "Trazodone, Celexa and

[B]u[S]par for about two years." *Id.* at pp 3. He told her his anxiety and depression

had increased, his sleep was poor, and he ran out of his medication two weeks prior.

*Id.* Nurse Shalloway ordered Trazodone, Celexa and BuSpar for Mr. Marles,

scheduled him for an evaluation, and gave him information about the suicide hotline.

*Id.* During his August 2019, visit, Mr. Marles denied suicidal thoughts. *Id.* at 2.

```
The patient was asked, "Over the past two weeks, how often have you been
bothered by thoughts that you would be better off dead or of hurting
yourself in some way?"
    Not At All
```

```
MH NEEDS IDENTIFIED AND ADDRESSED:
Veteran was seen at another VA in Conn after geting out of the military.
He has been  diagnoses with PTSD.  He had been trazodone, celexa and
buspar.  He states that he ran  out at least a couple of weeks ago.  he
had been on the medication for about 2 years.   Medications worked well.

Veteran states that in the past week  or so he has had an increase in
depression, and anxiety.  Sleep is poor.  He agrees that this is most likely due
to being without medication for the past few weeksd.

SUICIDAL IDEATION: Absent
HOMICIDAL IDEATION: Absent

MH FOLLOW-UP CARE PLAN: Meds ordered for veteran.  Veteran scheduled for
eval

VETERAN AGREES WITH PLAN? YES

LENGTH OF VISIT: 25 Minutes

Veteran was educated that in the event that they experience thoughts of
suicide or homicide to call Emergency Services 911, the national Veteran's
Crisis Line 1-800-273-TALK press 1, the WPB VAMC 561-422-8262 during
regular business  hours, or the VA tel-care Nurse 1-877-741-3400 during
after-hours, weekends, and holidays.
```

*Id.* On August 22, 2019, Mr. Marles visited the VA emergency department with complaints of chest pain. ECF No. 57-20 at pp 3. Four days later, on the morning of August 26, 2019, Mr. Marles called the suicide hotline. *Id.* at pp 2. His reasons for calling were suicidal thoughts, mental health/illness, and PTSD symptoms. *Id.* He was classified as "moderate to low suicide risk." *Id.* at pp 3. He had no plan for suicide, no past suicide attempts, did not answer when asked about access to means to hurt and access to firearms. *Id.* The call with the hotline lasted approximately 50 minutes. Later that afternoon, the VA followed up. *Id.* at pp 3–4. Mr. Marles reported that he was "good now" and plans to attend his future scheduled appointments with mental health services. *Id.*

On November 17, 2020, the VA evaluated Mr. Marles using the PHQ-2 and PHQ-9 depression screen. ECF No. 57-21. He scored a 5 on the PHQ-2 screen, "which is a positive screen for depression. *Id.* at pp 3. And, he scored a 20 on the PHQ-9 screen, "which is suggestive of severe depression." *Id.* Mr. Marles denied suicidal thoughts. *Id.* at 3–4.

```
9. Thoughts that you would be better off dead or of hurting yourself in
some way
Not at all

1. Over the past month, have you wished you were dead or wished you could
go to sleep and not wake up?
No

2. Over the past month, have you had any actual thoughts of killing
yourself?
No
```

*Id.*

Outside of the VA, Mr. Marles received primary care and prescription medications from Dr. Gabriel Gemayel. Joint SOF ¶3; Plaintiff Additional Facts ¶49. Dr. Gemayel treated Mr. Marles for depression and PTSD. *Id.* Mr. Marles' VA records no not list a primary care doctor, nor do the records reflect his past medical history with Dr. Gemayel. ECF No. 50-2.

On January 15, 2021, Mr. Marles visited the VA emergency department with gastrological complaints, chest pain, and anxiety relating to COVID-19. ECF No. 50-2 at pp 18. [2]Mrs. Marles recalls Mr. Marles telling her he was going to the VA because

---

[2]  Pursuant to Federal Rule of Evidence 201, I take judicial notice that common

he was having "body aches [] and [had] concern[s] [about] COVID-19. Joint SOF ¶5.

At the VA, Mr. Marles met with Registered Nurse Juanita Fairweather and Dr. Hema

Pandit. Joint SOF ¶¶6–10. Nurse Fairweather screened Mr. Marles using the

Columbia-Suicide Severity Rating Scale. *Id.* Mr. Marles answered "no" to the

screening questions, and his screen results were negative. *Id.* at ¶8. Nurse

Fairweather placed Mr. Marles on cardiac monitor and collected a urine specimen.

ECF No. 50-2 at pp 17. Mr. Marles received a physical examination, an EKG, a chest

x-ray, was tested for influence, and was tested for possible embolic or cardiac issues.

ECF No. 50-6 at pp 5. His pulse was 73, temperature 98.4, respirations 18, and blood

pressure 147/80. *Id.* Next, Mr. Marles met with Dr Pandit who noted the following in

Mr. Marles' chart:

```
CHIEF COMPLAINT/HISTORY OF PRESENT ILLNESS: 29yo BM w/ 3-4 days of insomnia,
sob, hallucinations, night sweats. H/O PTSD, but these hallucinations are a
little different "you know like dreams. They prevent me from sleeping. An
because I am not sleeping, the hallucinations are getting worse." Feeling
thirsty, polydipsia. Pt having anxiety over possible covid infection given his
sx which is the main reason he presented to the ER today.
H/O costochondritis and chronic intermittend chest pain which is unchanged.
"There was a lump behind my R ear that was swollen and hurting. NOw it's gone I
think. Then I have some circular rash on my back. I don't know may be I have
Covid."
Denies any URI sx, f/c, abd pain, d/c, HA, loss of smell/taste.
+Nausea at times.
Weight gain of 10+ pounds over the past 2 weeks.
Denies any depression, s/h/pi.
ROS:otherwise neg
```

symptoms of COVID-19 include, but are not limited to, a sore throat, chills, tight
chest, chest pain, and muscle aches. Fed. R. Evid. 201(c)(1); *Coronavirus disease
(COVID-19)* World Health Organization www.who.int/news-room/fact-
sheets/detail/coronavirus-disease-(covid-19)(last visited October 25, 2024).

ECF No. 50-2 at pp 20–21. Dr. Marles also noted a mental health history of "anxiety." *Id*. Mr. Marles agreed to follow up his primary care doctor after his visit. *Id*. at pp 2; ECF No. 49-1 at pp 9. Dr. Pandit also informed Mr. Marles about the mental health clinic and told him it was available if he decided to go. *Id*. at pp 12. Dr. Pandit discharged Mr. Marles after diagnosing Mr. Marles with anxiety and ruling out COVID-19. ECF No. 50-2 at pp 23. Mr. Marles' discharge chart includes the note "Pt directed to go 1C for mental health evaluation." ECF No. 52-2 at pp 17. The VA made a follow up appointment for February 1, 2021. ECF No. 50-3. The VA has no record of Mr. Marles visiting the mental health clinic. ECF No. 50-1. On the same day at 6:18p.m., Mr. Marles texted his mother that he "[w]ent to the VA and got help. Joint SOF ¶16. When asked what the VA did, Mr. Marles responded, "[a]ll of the test and stuff. I got [sic] covid symptoms. I need some sleep. I'll ttys and let you know if I got it." *Id*.

Mr. Marles returned to the VA's emergency room on January 18, 2021, where he was met with Registered Nurse Juan Rivera and Dr. Timothy Huber. ECF No. 50-2 at pp 5. According to Nurse Rivera's triage note, Mr. Marles had "worsening chills and mild sore throat." Joint SOF ¶19. Mr. Marles "denie[d] shortness of breath or other symptoms, inform[ed] [Nurse Rivera] there might be some anxiety "due to all this [sic] COVID issue" and deni[ed suicidal or homicidal ideas." *Id*. Nurse Rivera also screened Mr. Marles using the Columbia-Suicide Severity Rating Scale and the results were negative. *Id*. at ¶20. Mr. Marles' heart rate was 80, respirations were 18, blood pressure was 122/71. ECF No. 56-3 at pp 5. He was noted to be in no distress

14

and there was no evidence of mental confusion. *Id.* Next, Mr. Marles met with Dr.
Huber who noted the following in Mr. Marles' chart:

```
CHIEF COMPLAINT/REASON FOR VISIT: chills, bodyaches, anxious

============================================================
HPI:
A 29 year old BLACK OR AFRICAN AMERICAN, DECLINED TO ANSWERMALE presents to
ER with CC of chills, body aches.  29 year old otherwise healthy male comes to
Er complaining generalized bodyaches, arthralgias (hip, knee, back)as well as
anxiety.  Patient states symptoms began approx 3 days prior and was seen in ED
for similar without concerning findings.
```

ECF No. 50-2 at pp 6. Dr. Huber noted a negative COVID19 test 2 days prior, a clear
chest x-ray and negative labs and influenza. *Id.* at pp 8; Joint SOF ¶23. Dr. Huber's
plan for Mr. Marles was to "treat empirically" and he recommended follow up with
"primary care in 1 week as needed." *Id.* Dr. Huber's final diagnosis was "viral
syndrome, anxiety reaction." Joint SOF ¶26. Dr. Huber later testified that anxiety
reaction means "they don't suffer from anxiety, but they're having an anxiety
reaction, a brief, short-lived anxiety — I won't say attack, I guess —due to some other
circumstances, a stressor." ECF No. 49-2 at pp 58. Dr. Huber also prescribed
Mr. Marles a short course of low-dose lorazepam and ibuprofen. ECF No. 50-2 at pp
3.

On January 18, 202[1], the walk-in mental health clinic Unit 1C was closed
due to the federal holiday. ECF No. 50-1 at ¶17. Mrs. Marles testified that she was
home with Mr. Marles between January 15 and January 18, 2021. ECF No. 50-9 ¶¶
9–10. According to Mrs. Marles, Mr. Marles did not have trouble sleeping during that
time period, he did not report that he was having "crazy" dreams, experiencing

15

hallucinations, or hearing or seeing things that were not there. ECF No. 49-7 at pp 275–276. Mrs. Marles testified that she did not have any concerns that Mr. Marles was suicidal, and that he never complained to her about any mental health concerns aside from anxiety. *Id.* at pp 276.

Mr. Marles died by suicide on January 19, 2021. ECF No. 50-5. at pp 3. Mr. Marles autopsy shows no benzodiazepine detected in his blood. Joint SOF ¶28. [3]

Mrs. Marles experts testify that Mr. Marles presented to the Emergency Department at the VA with "acute psychosis" on both occasions and a psychiatric consult should have been called. ECF No. 69-3 at 55–57; *see also* ECF Nos. 50-5–7, 57-8–9. They conclude the VA deviated from the standard of care. *Id.*[4] The Government's expert, Dr. Richard Elliot testifies that "the evaluation of [Mr. Marles'] symptoms by emergency room providers was appropriate for the complaints indicated in [Mr. Marles'] medical records for those two visits." ECF No. 56-3.

### III.    DISCUSSION

---

[3] Lorazepam is a benzodiazepine medication approved by the US Food and Drug Administration for short-term relief of anxiety symptoms associated with anxiety disorders, anxiety-related insomnia, anesthesia premedication in adults to relieve anxiety or induce sedation or amnesia, and treatment of status epilepticus. National Library of Medicine, Lorazepam www.ncbi.nlm.nih.gov/books/NBK532890/ (last visited October 17, 2024).

[4] Plaintiff's experts do not address the Good Samaritan Act nor the heightened standard of care under the Good Samaritan Act. *See* ECF Nos. 50-5–7, 57-8–9.

A. *The Good Samaritan Act applies.*

The Government raises the Good Samaritan Act as one of its affirmative defenses. ECF No. 18 at 14. Mrs. Marles argues the heightened standard under the Good Samaritan Act does not apply because Mr. Marles did not present with an "emergency medical condition." In support, Mrs. Marles says that the Nurse on January 18, 2021, rated Mr. Marles a level four on the Emergency Severity Index, which is the lowest level of severity and therefore he was not experiencing an "emergency medical condition. ECF No. 58 at pp 7. I disagree. First, Mrs. Marles cites no authority nor can this Court, after diligent search, find authority in support of that argument. Second, the Good Samaritan Act applies to any act or omission (including diagnosis) "which occurs prior to the time the patient is stabilized and capable of receiving medical treatment as a nonemergency patient." Fla. Stat. 768.13(2)a. Said another way, the issue is whether Mr. Marles was stabilized and capable of receiving medical treatment as a nonemergency patient when he arrived at the VA. *Univ. of Florida Bd. of Trustees v. Stone*, 92 So. 3d 264 (Fla. 1st DCA 2012). The answer is no.

Mr. Marles arrived at the VA emergency department on January 15, 2021, during the COVID-19 pandemic, expressing gastrological complaints, chest pains, and anxiety relating to COVID-19 and then again three days later with a sore throat, chills, body aches, and anxiety surrounding COVID-19. He could not have been treated as a nonemergency patient when he arrived because of the symptoms he presented. He had to be placed on a cardiac monitor and tested for COVID-19 first. Dr. Pandit and Dr. Huber then evaluated, assessed, diagnosed, and discharged him

with a follow up plan that included medication. It was *then* that he became stabilized and capable of receiving medical treatment as a nonemergency patient. And viewing the evidence in the light most favorable to Mrs. Marles, no reasonable jury could find that Mr. Marles *was* stabilized and capable of receiving medical treatment as a nonemergency patient when he arrived at the VA. *Stone*, 92 So.3d at 271.

Mrs. Marles next argues that the Good Samaritan Act only "applies to medical care occurring *prior to the time* the patient is stabilized… [and because Mr. Marles] did not die from complications related to [] the medical conditions he presented with prior to the time he was stabilized… the [Good Samaritan Act] does not apply." ECF No. 58 at pp 9. (emphasis in original). But the plain language in the Good Samaritan Act does not require a patient to have died from any of the conditions presented. Only that the treatment be related to the original medical emergency. And, even viewing the undisputed facts in the light most favorable Mrs. Marles, the treatment on January 15 and 18, 2021, was related to the medical emergency.

Therefore, the heightened standard under the Good Samaritan Act applies to any acts or omissions Dr. Pandit, Dr. Huber and the respective nurses took *before* ruling out COVID-19 and diagnosing Mr. Marles.

### B. *Reckless disregard*

The VA argues that as a matter of law, its health care practitioners did not "know or should have known, at the time services were rendered, [that their conduct would] create an unreasonable risk of injury so as to affect the life or health of another, and such risk was substantially greater than that which is necessary to

18

make the conduct negligent." Fla. Stat. 768.13(2)(b); ECF No. 55 at pp 8. In support, the VA says Mrs. Marles did not present expert medical testimony on reckless disregard and therefore as a matter of law, cannot establish that VA breached its standard of care. ECF No. 55 at pp 8.

Mrs. Marles does not dispute that her three experts do not opine on reckless disregard. Instead, she argues Mr. Marles was not experiencing an "emergency medical condition" and argues that VA failed to produce evidence or testimony that Mr. Marles was "in imminent danger of death or serious disability" as defined in the Emergency Medical Treatment and Labor Act ("EMTLA"). ECF No. 58 at pp 7–8; 42 U.S.C. 1395(d)(e)(1).

First, Mrs. Marles does not respond to the VA's argument regarding reckless disregard. Therefore, that argument is conceded. *See Jones v. Bank of Am., N.A.*, 564 Fed. Appx. 432, 434 (11th Cir.2014) (holding "[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. ... [W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

Second, for the reasons discussed above, as a matter of law Mr. Marles was experiencing an emergency medical condition, so the Good Samaritan Act applies. Third, the VA raised the Good Samaritan Act as an affirmative defense, not the EMTLA, and I am bound by the standards and definitions in the Good Samaritan Act. *Stone,* 92 So. 3d at 269 (rejecting alternative definitions for "emergency services" and noting "[t]he plain language of the GSA defines its scope and, therefore, it is

unnecessary to look outside the Act for clarification of its terms."). And, at this stage, the burden was Mrs. Marles' to show a genuine dispute of material fact that the VA healthcare practitioners acted with "reckless disregard" for the consequences of their actions. Fla. Stat. § 768.13(2)(b). She has failed to sufficiently do so.

There is no genuine dispute that the nurses met with Mr. Marles, noted his COVID-19 concerns, his chest pains, his gastrological complaints, and his mental health related symptoms, and then screened and monitored him according to those symptoms. For example, in relation to his chest pains, Mr. Marles was placed on a cardiac monitor; for his mental health issues, Mr. Marles was screened using the Columbia suicide severity rating scale and was asked follow-up questions regarding exposure to COVID-19. The nurses also took Mr. Marles' vitals.

Likewise, there is no genuine dispute that the doctors carefully evaluated Mr. Marles. Dr. Pandit discussed Mr. Marles' bloodwork, answered his questions, ruled out COVID-19, diagnosed Mr. Marles with anxiety, and informed him about the mental health clinic. Dr. Huber noted a negative COVID-19 test, clear chest x-ray and negative labs and influenza. Dr. Huber diagnosed Mr. Marles with viral syndrome, anxiety reaction and prescribed low dose lorazepam and ibuprofen. Mr. Marles' autopsy shows no indication that Mr. Marles ever took the lorazepam.

Even viewed in the light most favorable to Mrs. Marles, no reasonable jury could conclude that healthcare practitioners "knew or should have known at the time [they rendered services] that their conduct created an unreasonable risk of injury so

as to affect [Mr. Marles'] life or health and that such risk was substantially greater than that which is necessary to make the conduct negligent." Fla. Stat. 768.13(2)(b).

## IV.    CONCLUSION

Viewing the evidence in the light most favorable to Mrs. Marles, the Good Samaritan Act applies and no reasonable jury, viewing the undisputed facts could conclude that the VA healthcare practitioners acted with reckless disregard. For these reasons, under the Good Samaritan Act, the VA is immune for the care its healthcare practitioners provided on January 15, 2021, and January 18, 2021. Therefore, I do not reach the standard of care under general medical negligence, or the arguments presented in the cross *Daubert* motions.

## **REPORT AND RECOMMENDATION**

Accordingly, this Court **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment and **DENY** the remaining pending motions as **MOOT**.

### NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Aileen M. Cannon, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 25th day of October 2024.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE