UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80911-CIV-CANNON

**BRENDA LEIGH MARLES**,
and **THE ESTATE OF RICO MARLES**,

    Plaintiffs,
v.

**UNITED STATES OF AMERICA**,

    Defendant.
_____/

## ORDER ACCEPTING IN PART AND REJECTING IN PART MAGISTRATE JUDGE'S OMNIBUS REPORT AND RECOMMENDATION [ECF No. 78]

**THIS CAUSE** comes before the Court upon Defendant's Partial Motion to Dismiss [ECF No. 48], Defendant's Motion for Summary Judgment [ECF No. 55], as well as the parties' Cross *Daubert* Motions [ECF Nos. 51, 52] (collectively, the "Motions"). The Motions were referred to Magistrate Judge Bruce E. Reinhart for a report and recommendation [ECF No. 74]. On October 25, 2024, Magistrate Judge Reinhart issued a report recommending that Defendant's Partial Motion to Dismiss be granted by stipulation of the parties; Defendant's Motion for Summary Judgment be granted; and the parties' Cross *Daubert* Motions be denied as moot in light of the summary judgment ruling in favor of Defendant (the "Report") [ECF No. 78]. Plaintiffs filed Objections to the Report [ECF No. 80], to which Defendant filed a Response [ECF No. 83]. The Court has reviewed the Report [ECF No. 78] and the full record. For the reasons set forth below, the Report [ECF No. 78] is **ACCEPTED IN PART AND REJECTED IN PART**, Defendant's Partial Motion to Dismiss [ECF No. 48] is **GRANTED** by stipulation of the parties [ECF Nos. 78 p. 2; ECF No. 60], and Defendant's Motion for Summary Judgment [ECF No. 55] is **DENIED**.

**RELEVANT FACTUAL BACKGROUND**

The following facts are undisputed.[1]  Rico Marles died by suicide on January 19, 2021, at 29 years old [ECF No. 9 ¶ 2].  His death was the culmination of a multi-year mental health struggle, beginning when he was honorably discharged from the United States Marine Corps after serving two tours in Afghanistan [ECF No. 67 ¶ 48].  In the days leading up to his death, Mr. Marles twice visited the West Palm Beach Veterans Affairs Medical Center ("VAMC") to receive treatment—treatment that Plaintiffs, his widow and his mother, now claim was negligent [ECF No. 9].  Because of the nature of these claims, the Court begins with a recitation of Mr. Marles' medical history.

I.      **Mr. Marles' Medical History**

Mr. Marles' pertinent medical history, as provided to the Court based on the summary judgment record, can be broken down into two categories: his routine primary care with Dr. Gemayel at West Palm Medical Group and his "compensation and pension exams" ("C&P exams") and emergency visits with various doctors at VAMC. [2]

Mr. Marles first saw his primary care doctor, Dr. Gemayel, in December 2017 and reported that he "has been treated for insomnia, depression, and PTSD [post-traumatic stress disorder]"

---

[1] These facts are drawn from the parties' Joint Statement of Undisputed Facts [ECF No. 53]; additional undisputed facts as listed in the parties' respective statements of facts [ECF Nos. 54, 67, 71]; and exhibits attached by the parties as to which neither side lodges a dispute or authenticity challenge [ECF Nos. 50, 57].  The Court views the facts in the light most favorable to Plaintiffs, as the non-moving parties. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).

[2] C&P exams are medical exams requested by the Department of Veterans Affairs to assess claims for disability benefits.  *See* https://www.va.gov/disability/va-claim-exam/.  Mr. Marles was given disability benefits for "posttraumatic stress disorder, unspecified depressive disorder and unspecified anxiety disorder (claimed as depression and insomnia)," "service connection for gastroesophageal reflux disease, irritable bowel syndrome and gastritis (claimed as GERD and esophagitis)," and "migraines" in September 2018 [ECF No. 57-17].  His benefits for "posttraumatic stress disorder (PTSD) with unspecified depressive, anxiety, and panic disorder, without agoraphobia" were continued in June 2019 [ECF No. 57-18].

since February 2016; that he "had seen a therapist"; and that his medication was helping currently because he wasn't having panic attacks as frequently [ECF No. 57-13 (12/20/2017 Progress Note, written by Dr. Gemayel)]. At the time, Dr. Gemayel noted that Mr. Marles indeed had PTSD, anxiety, depression, and insomnia—and continued Mr. Marles' pre-existing prescriptions for medications to treat those conditions (Citalopram, Clonazepam, and Trazadone) [ECF No. 57-13 p. 3]. Over the next two years, Mr. Marles saw Dr. Gemayel several other times—in January 2018 [ECF No. 57-14], April 2018 [ECF No. 57-15], and August 2018 [ECF No. 57-16]. In January 2018, Dr. Gemayel refilled Mr. Marles' medications, increased his Trazadone dosage, and referred him to a psychiatrist [ECF No. 57-14]. In April 2018, Dr. Gemayel again refilled his prescriptions and noted that the Trazadone was helping combat Mr. Marles' insomnia [ECF No. 57-15]. Then, in August 2018, Mr. Marles did not report any mental health symptoms to Dr. Gemayel; in fact, the appointment was set up to treat shin splints and migraines, but Dr. Gemayel refilled Mr. Marles' PTSD, insomnia, anxiety-and-depression related prescriptions anyway [ECF No. 57-15].

Prior to the two visits leading up to his death, Mr. Marles went to VAMC for two main purposes: the Emergency Department, which he visited in February 2017, August 2019, and September 2019, and to receive C&P exams, which he underwent in February, March, and November of 2018 [ECF No. 53 ¶ 4; ECF No. 50-1 ¶¶ 26–29 (Declaration of April Shelt interpreting Mr. Marles appointment history and health chart); ECF Nos. 50-2, 50-3]. During the August 2019 visit to the Emergency Department, Mr. Marles reported an increase in depression and anxiety and poor sleep quality [ECF No. 57-19 p. 3]. He speculated that it was likely due to his failure to take prescribed medication in the weeks leading up to the visit [ECF No. 57-19 p. 3]. A few weeks later, he made an approximately one-hour call to a suicide hotline and reported that he "ha[s] had thoughts of suicide within the past few months," "has been struggling physically and

3

mentally," and feels as though he "cannot find [him]self" [ECF No. 57-20 p. 2]. When the VAMC local suicide prevention coordinator followed up with Mr. Marles via phone on August 26, 2020—two days after he called the hotline—he denied having active thoughts of suicide or an intent or plan to commit suicide [ECF No. 57-20 p. 4]. Then, in November 2020, Mr. Marles met with a social worker at VAMC who performed several tests: the PHQ-2 test concluded that Mr. Marles had "severe depression," but the Columbia Suicide Scale screener yielded answers that Mr. Marles did not "wish he was dead" and did not have any thoughts of killing himself in the past month [ECF No. 57-21]. The record does not include any interaction between VAMC and Mr. Marles from November 2020 until January 2021, which is discussed below.

## II. The 2021 VAMC Visits

Mr. Marles visited VAMC twice—on January 15 and January 18, 2021—before taking his own life on January 19, 2021 [ECF No. 53]. During his January 15 visit with Nurse Fairweather and Dr. Pandit, Mr. Marles principally complained of "[a] possible covid infection," but also of anxiety because of that potential infection, "lightheaded[ness], dehydrat[ion], chest pain," an inability to sleep, and "crazy dreams" [ECF Nos. 52 ¶¶ 6–9, 50-2 pp. 18–21 (Progress Notes from the 1/15 Visit)]. Specifically, regarding the dreams, Mr. Marles told the attending physicians that "the hallucinations are a little different," "you know, like dreams. They [the dreams] prevent me from sleeping. And because I am not sleeping, the hallucinations are getting worse." Mr. Marles also mentioned that he was under a lot of recent stress because he was starting a new business [ECF No. 53 ¶ 14; ECF No. 50-2 p. 20]. The attending physicians noted that Mr. Marles had a "4/10 pain scale," "denies sick contact or covid exposure," and "is not a fall risk" [ECF No. 50-2 p. 18].

The attending physicians administered the Columbia Suicide Scale screener, but Mr. Marles said that he did not "wish he was dead" and did not have any thoughts of killing himself in

4

the past month [ECF No. 50-2 p. 19].  Dr. Pandit diagnosed Mr. Marles with anxiety and did not rule out a potential Covid-19 diagnosis pending test results (which turned out to be negative as indicated below) [ECF No. 50-2 p. 23].  Upon discharge, Mr. Marles was directed "to go to 1C for [a] mental health evaluation," which is the walk-in mental health clinic at VAMC, but he never did [ECF No. 50-2 p. 17; ECF No. 53 ¶¶ 1, 14].

When Mr. Marles returned to VAMC three days later on January 18, 2021, to see Nurse Rivera and Doctor Huber, Mr. Marles complained of "worsening chills and mild sore throat," but told the attending physicians that it might be anxiety due Covid-19 [ECF No. 53 ¶¶ 18, 19; ECF No. 50-2 p. 11 (Progress Notes from the 1/18 Visit)].[3]  Mr. Marles had tested negative for Covid-19 two days earlier (January 16, 2021) [ECF No. 53 ¶ 23; ECF No. 50-2 p. 8].  Notably, the attending physicians observed that Mr. Marles "return[ed] with normal vital signs and clear lungs" and that he "appears well and. . . in no distress" [ECF No. 50-2 p. 8].  The attending physicians administered the Columbia Suicide Scale screener, and Mr. Marles again said that he did not "wish he was dead" and did not have any thoughts of killing himself in the past month [ECF No. 53 ¶ 20; ECF No. 50-2 p. 13].  Dr. Huber diagnosed Mr. Marles with "viral syndrome [and] anxiety reaction," and Mr. Marles was discharged with instructions to schedule a follow up with a primary care provider [ECF No. 53 ¶ 26; ECF No. 50-2 p. 5].  The next day, Mr. Marles took his own life while lying in bed next to his wife, Plaintiff Brenda Marles.

**III.     Marles' Family and VAMC Meeting**

In October 2021, nine months after Mr. Marles committed suicide, Plaintiff Brenda Marles and Mr. Marles' mother Yvette Fort, met with VAMC and its representatives.  During that meeting, VAMC's representative stated the following to Mrs. Marles and Mrs. Fort:

---

[3] The Court takes judicial notice that January 18, 2021, was a federal holiday, and so the mental health clinic to which Mr. Marles was directed on January 15 was closed.

5

> But we're here to apologize, ma'am, and say we did something wrong. We have found areas of opportunity that we definitely will be changing for the sacrifice that your husband did, both in combat and here, in the combat of healing, which we failed him . . . . We did something wrong, okay. He left this building and we didn't surround him with the care to protect him . . . . We have experts that said we could have done something different, and there's no doubt about that. In each one of these cases, we analyze what could we have done differently.

[ECF No. 57-10].

## PROCEDURAL HISTORY

In June 2023, Plaintiff Brenda Marles, on behalf of herself and the Estate of her late husband, filed the two-count operative complaint (the "Complaint") against the United States for (I) wrongful death under the Federal Tort Claims Act ("FTCA"), Title 28 U.S.C. §§ 2671–80, and Florida's Wrongful Death Statute, Fla. Stat. § 768.21; and (II) negligent infliction of emotional distress under Florida common law [ECF No. 9]. In February 2024, Defendant moved to dismiss Plaintiffs' negligent infliction of emotional distress claim (Count II) for lack of exhaustion under the FTCA [ECF No. 33], which the Court granted [ECF No. 47]. *See* 28 U.S.C. § 2675(a) (requiring that the claim be first presented to the Veterans Administration before an action is brought). A few months later, Defendant filed the instant Partial Motion to Dismiss the remaining wrongful death claim insofar as it pertains to Plaintiffs' argument that VAMC's electronic records system ("VA EHR") should have alerted the attending physicians to Mr. Marles' full medical history, arguing that the claim is barred by sovereign immunity and was not exhausted during the administrative claim process [ECF No. 48]. That same day, Defendant also filed the instant Motion for Summary Judgment on all claims [ECF No. 55]. These motions, as well as the parties' cross *Daubert* motions filed the same day, were referred to Magistrate Judge Reinhart for a report and recommendation [ECF No. 74]. The Report and the underlying Motions are ripe for review.

CASE NO. 23-80911-CIV-CANNON/Reinhart

# **LEGAL STANDARDS**[4]

## I. Report and Recommendations

To challenge the findings and recommendations of a magistrate judge, a party must file specific written objections identifying the portions of the proposed findings and recommendation to which objection is made. *See* Fed. R. Civ. P. 72(b)(3); *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989); *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006). A district court reviews de novo those portions of the report to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1). To the extent a party fails to object to parts of the magistrate judge's report, the Court may accept the recommendation so long as there is no clear error on the face of the record. *Macort*, 208 F. App'x at 784. Legal conclusions are reviewed de novo, even in the absence of an objection. *See LeCroy v. McNeil*, 397 F. App'x 554, 556 (11th Cir. 2010); *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994).

## II. Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

[4] The parties have stipulated to Defendant's Partial Motion to Dismiss [ECF Nos. 48, 60], specifically dismissal of Count I as it relates to the VA EHR system. The parties have also stipulated to the exclusion of Dr. Louis' Rule 26 report and deposition to the degree that they reference the VA EHR system. On account of those stipulations, as discussed above, the Court agrees with the Report to grant Defendant's Partial Motion to Dismiss, leaving no need to address the legal standard governing motions to dismiss for lack of administrative exhaustion.

(1986). At summary judgment, the moving party has the burden to prove the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252. "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney*, 247 F.3d at 1181. Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e), (c). In that instance, a non-moving party's failure to produce evidence for an essential element of a claim warrants summary judgment in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

## DISCUSSION

The Report concludes that Defendant's Partial Motion to Dismiss Plaintiffs' wrongful-death claim should be granted due to a stipulation of the parties; Defendant's Motion for Summary Judgment should be granted; and the parties' cross *Daubert* Motions should be denied as moot in light of the summary judgment ruling in favor of Defendant [ECF No. 78]. The Court agrees with

the Report with respect to Defendant's Partial Motion to Dismiss but rejects the Report as to Defendant's Motion for Summary Judgment, for the reasons stated below [ECF No. 55].

At a high level, the Report determines that Florida's Good Samaritan Act (the "GSA"), Fla. Stat. § 768.13(2)(b)(2)—which imposes a heightened standard of reckless disregard in civil suits against health care providers for qualifying "emergency" services—applies to the wrongful death claim in Count I of Plaintiffs' Complaint [ECF No. 78 p. 18].[5] The Report further concludes that judgment as a matter of law is warranted in Defendant's favor because no reasonable jury could conclude that the VAMC acted with reckless disregard when treating Mr. Marles [ECF No. 78 p. 21]. Plaintiffs make one principal argument in opposition to these determinations: the Report errs in concluding that the GSA applies to Mr. Marles' care on January 15 and 18, 2021, or at the very least, the Report errs in failing to find that application of the GSA raises a triable question of fact as to whether VAMC provided "emergency" services in the first instance [ECF No. 80 p. 3]. In Plaintiffs' view, the VAMC was not treating Mr. Marles on the January 15 or January 18 visits under the kind of "emergency circumstances" that trigger application of the GSA—citing his reports of flu-like symptoms on January 15 and body aches and anxiety on January 18 [ECF No. 80 pp. 10–12]. In response, Defendant argues that the context surrounding the visit—during the "height of the Covid-19 pandemic"—informed the Report's determination that the visits were for "emergency services" and therefore warranted application of the GSA as a matter of law [ECF No. 83 p. 3].[6] Further, Defendant insists that, since the GSA applies, and since the Report properly

---

[5] If the GSA does not apply, the standard of care imposed is "'that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102(1). *See Chirillo v. Granicz,* 199 So. 3d 246, 250 (Fla. 2016).

[6] The parties dispute whether the Good Samaritan Act is triggered when the treatment is under "emergency circumstances" [ECF No. 80 p. 4] or when "emergency services" are provided [ECF No. 83 p. 4]. The "emergency circumstances" trigger refers to section 2(a) of the GSA,

concludes that Plaintiffs failed to produce evidence that VAMC acted with reckless disregard toward Mr. Marles, judgment as a matter of law is warranted in its favor [ECF No. 83 p. 12].

Upon review of the Report and the parties' arguments, the Court agrees with Plaintiffs that the threshold question of whether Mr. Marles was provided emergency services sufficient to trigger application of the GSA raises subsidiary questions of fact warranting a trial. The Court therefore rejects the portion of the Report that applies the GSA as a matter of law.[7] And, given that Defendant fails to demonstrate that judgment as a matter of law is warranted in its favor even assuming that a negligence standard applies, the Court denies summary judgment.

I. **Application of the Good Samaritan Act raises a triable question of fact in this case.**

The Report concludes that the GSA applies to the doctors treating Mr. Marles on both January 15 and 18, 2021, because Mr. Marles "could not have been treated as a nonemergency patient when he arrived because of the symptoms he presented. He had to be placed on a cardiac monitor and tested for COVID-19 first" [ECF No. 78 p. 17].

The GSA provides that:

Any healthcare provider . . . providing emergency services . . . shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failing to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another.

Fla. Stat. § 768.13(2)(b)(1). "The threshold question in determining the applicability of the Good Samaritan Act is whether the healthcare provider was providing 'emergency services' to the

---

which applies to treatment "outside of a hospital, doctor's office, or other place." Fla. Stat. § 768.13(2)(a). The relevant subsection here is (2)(b)(1), which speaks in terms of individuals who provide emergency services." Fla. Stat. § 768.13(2)(b)(1).

[7] The parties' cross-*Daubert* motions—which the Report denied as moot—are addressed in a separate order. Given that Order's conclusion that Dr. Bruce is precluded from testifying, the Court does not examine his Reports as part of the summary judgment record. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Evidence inadmissible at trial cannot be used to avoid summary judgment.") (citation, internal quotation marks, and alteration omitted).

patient." *Cantore v. W. Boca Med. Ctr., Inc.*, 254 So. 3d 256, 260 n.2 (Fla. 2018) (quoting Fla. Stat. § 768.13(2)(b)(1)). This is because the GSA provides a heightened standard of proof that extends only to those actions "occurring[ing] prior to the time the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient . . . ." Fla. Stat. § 768.13(2)(b)(2)(a). *See Univ. of Fla. Bd. of Trustees v. Stone ex rel. Stone*, 92 So. 3d 264, 270 (Fla. Dist. Ct. App. 2012) ("[T]he plain language of the GSA, focuses on whether the patient's emergency medical condition was stabilized to the point that it no longer required emergency care."). In other words, the GSA contains both subject and temporal limitations: the services must be emergency services in the context of a sudden, unexpected situation or event resulting in a serious medical condition demanding immediate medical attention, and they must be provided before the patient is stable and capable of being treated as a non-emergency patient.

Upon review of the summary judgment record in this case, the Court determines that the threshold determination of whether the VAMC provided "emergency services" to Mr. Marles presents subsidiary questions of fact that are properly reserved for the finder of fact. *See* Fla. Stat § 768.13(2)(b)(2). Some courts in Florida have decided this issue as a matter of law, most usually where the emergency nature of the services is self-evident. Take, for example, situations where the service was endotracheal intubation after the patient "was engulfed in flames for approximately thirty seconds . . . and suffered second and third degree burns over eighty-five percent of his body," *Jackson Cnty. Hosp. Corp. v. Aldrich*, 835 So. 2d 318, 322 (Fla. Dist. Ct. App. 2002); where the service was emergency anesthesia after a patient had a "reaction to a medication which caused his throat and tongue to swell," *Harris v. Soha*, 15 So. 3d 767, 768 (Fla. Dist. Ct. App. 2009); where the service was emergency transfer to another hospital after the patient "sustained a severe brain injury," *Garcia v. Randle-E. Ambulance Serv., Inc.*, 710 So. 2d 74, 75 (Fla. Dist. Ct. App. 1998); and where the service was emergency surgery for internal bleeding when the patient had "a

11

fractured pelvis and grade five splenic laceration," *Christensen v. Cooper*, 972 So. 2d 207, 209 (Fla. Dist. Ct. App. 2007). In this line of cases, Florida courts have applied the GSA as a matter of law in circumstances where no reasonable juror could have concluded otherwise.

But a recent Florida Civil Jury Instruction points strongly to the possibility that, at least in some cases, the preliminary issue of application of the GSA—i.e., whether the provider treated the claimant under "emergency circumstances"—itself hinges on contested issues of fact to be made by the factfinder. *See* Fla. Std. Jury Instr. 402.16a (Appendix E) ("[Care] [treatment] is rendered under emergency circumstances when a [hospital] [physician] renders medical [care] [treatment] required by a sudden, unexpected situation or event that resulted in a serious medical condition demanding immediate medical attention, for which (claimant or decedent) initially entered the hospital through its [emergency room] [trauma center], before (claimant or decedent) was medically stabilized and capable of receiving [care] [treatment] as a nonemergency patient."). This case falls into that category.

A careful review of the record reveals evidence on both sides of the balance as to whether Mr. Marles received "emergency services" on January 15 and 18 for purposes of applying the GSA's heightened standard of proof. On the one hand, portions of the summary judgment record suggest strongly that the VAMC did not render emergency services to Mr. Marles on either day, because he was medically stabilized and capable of receiving care as a nonemergency patient. *See* Fla. Stat. § 768.13(2)(b)(2)(a); Fla. Std. Jury Instr. 402.16a. For example, on January 15, despite coming to the VAMC complaining of "chest pain, lightheaded[ness], [that he] feels dehydrated, [and is] unable to sleep and having crazy dreams" [ECF No. 53 ¶ 7 (Assessment Notes of Nurse Fairweather)], "Marles's vital signs were [] noted as *normal*" [ECF No. 54 ¶ 18]. The attending nurse observed that Mr. Marles was "unsure if he had a fever" and "denie[d] chills, cough, shortness of breath" [ECF No. 53 ¶ 7]. "He is masked and denies covid exposure or sick contact"

12

[ECF No. 53 ¶ 7 (Assessment Notes of Nurse Fairweather)]. Similarly, on January 18, Mr. Marles' attending nurse noted that he came into the VAMC with "worsening chills and mild sore throat . . . [but was] *in no distress*" [ECF No. 53 ¶ 21 (Assessment Notes of Nurse Rivera) (emphasis added)]. And, by his January 18 visit, it is undisputed that Mr. Marles had tested negative for Covid-19 two days before.[8] The notes by the attending physician, coupled with the nature of the symptoms, suggest that Mr. Marles was capable of receiving treatment as a nonemergency patient, unlike the emergency patients in Florida cases that have applied the GSA. *See Jackson Cnty. Hosp. Corp.*, 835 So. 2d at 322; *Harris*, 15 So. 3d at 768; *Garcia*, 710 So. 2d at 75; *Christensen*, 972 So. 2d at 209.[9]

On the other hand, as the Report determines, Mr. Marles "had to be placed on a cardiac monitor and tested for COVID-19 first" before he could receive other treatment [ECF No. 78 p. 17].[10] Mr. Marles reported "chest pains" and "having crazy dreams" [ECF No. 53 ¶ 7 (Assessment Notes of Nurse Fairweather)]; he also had come into the emergency room three days before, and the Covid-19 pandemic remained a very serious issue nationwide.

Given the contradictory evidence and disputed issues of fact, the determination of whether Mr. Marles received treatment under emergency circumstances is best left to the Court as factfinder

---

[8] The parties generally dispute the level of access the attending physician had to Mr. Marles' medical records [ECF No. 55 p. 20; ECF No. 72 p. 9].

[9] Defendant cites no case applying the GSA in the context of medical symptoms/conditions analogous to those presented by Mr. Marles on January 15 or 18, 2021. The only GSA case cited by Defendant is *Stone ex rel. Stone*, 92 So. 3d at 272, but there, the state appellate court reversed a lower court's legal application of the GSA, where the immediate nature of the medical situation (stomach surgery) was arguably significantly more critical and unstable than the circumstances presented by Mr. Marles.

[10] The record does not indicate whether placement on a cardiac monitor is, by itself, indicative of an emergency situation.

in a forthcoming bench trial. *See Stone ex rel. Stone*, 92 So. 3d at 272 (reversing directed verdict on application of GSA where emergency determination hinged on disputed facts).

> **II. Even assuming the GSA's heightened recklessness standard does not apply, factual issues preclude summary judgment in favor of Defendant under a negligence standard.**

Having concluded that the preliminary issue of application of the GSA is properly reserved for the factfinder, the Court next determines whether judgment as a matter of law is warranted under a negligence standard. The answer is no because genuine issues of material fact remain as to breach of duty and causation.

"To establish a cause of action for negligence in a wrongful death action, a plaintiff must allege and prove (1) the existence of a legal duty owed to the decedent, (2) breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages." J*enkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. Dist. Ct. App. 2003). "The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may lie." *Id*. The Florida Supreme Court recently resolved "[t]he conflict issue [] concern[ing] the proper determination of a physician's duty to an [out]patient who commits suicide." *Chirillo v. Granicz*, 199 So. 3d 246, 250 (Fla. 2016). The Court held that "Florida law has not extended the duty to prevent suicide to an outpatient scenario," like it does for inpatient decedents, and so "[a]lthough the inpatient duty to prevent suicide does not apply here, there still existed a statutory duty under section 766.102 to treat the decedent in accordance with the standard of care." *Id*. at 251–252. Therefore, the general duty of care that physicians owe their patients who have committed suicide in an outpatient context is "'that level of care, skill, and treatment which, in light of all relevant surrounding circumstances is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102(1). The court "look[s] to

the depositions of the experts—filed with the motion for summary judgment—to determine the applicable standard of care." *Chirillo*, 199 So. 3d at 252.

Examining the summary judgment record, particularly the conflicting expert testimony, the Court finds that Defendant's alleged breach of its duty of care—even under a negligence standard rather than a GSA-triggered recklessness standard—raises a triable question properly reserved for the factfinder. Put another way, there is a genuine issue of material fact as to whether VAMC, specifically Drs. Pandit and Huber, breached their duty to Mr. Marles during the January 15 and 18 visits. In support of their position that VAMC breached the duty of care owed to Mr. Marles, Plaintiffs submit the following evidence: two rebuttal expert reports of Drs. Louis and Zun [ECF No. 67-1; ECF No. 57-9 (Dr. Zun Report); ECF No. 50-7 (Dr. Louis Report)], along with their deposition testimony; plus the deposition testimony of Dr. Naik [ECF No. 57-2], Dr. Pandit [ECF No. 57-3], Nurse Fairweather [ECF No. 57-6], Dr. Huber [ECF No. 57-7], Nurse Rivera [ECF No. 57-22], and Dr. Perez [ECF No. 57-23]. Defendant, in arguing under the GSA that the attending physicians were not reckless in treating Mr. Marles, submitted expert reports and testimony by Drs. Elliott and Pirotte; deposition testimony of VAMC Risk Manager April Shelt [ECF No. 50-1]; Ronald Williams, a VAMC employee [ECF No. 50-1]; documentary evidence of Mr. Marles' medical, appointment, and pharmaceutical history [ECF No. 50-2; 50-3; 50-4]; and accompanying deposition transcripts (Dr. Louis, Dr. Naik, Dr. Pandit, Nurse Fairweather, Dr. Huber, Nurse Rivera, and Dr. Bruce) [ECF No. 49].

As established above, "[i]n medical malpractice cases, the standard of care is determined by a consideration of expert testimony." *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995). So the crucial pieces of evidence for this narrow determination are the dueling expert reports by Drs. Louis, Zun, Pirotte, and Elliott. For Plaintiffs' part, Dr. Zun concluded that Defendant breached the standard of care on both January 15 and 18 by not ordering a mental health evaluation in the

emergency room due to Mr. Marles' medical history and complaints of "hallucinations" [ECF No. 57-9]. Dr. Louis similarly concluded that Defendant did not meet the standard of care on either day because the doctors "missed a psychiatric emergency" and did not order a mental health consultation for Mr. Marles. More specifically, Dr. Louis took issue with the doctors affording more weight to the C-SSRS test than was warranted given its unreliability and their failure to order a more comprehensive evaluation in light of Mr. Marles' specific symptoms (chest pain, hallucinogenic dreams, and trouble sleeping) [ECF No. 67-1]. For Defendant's part, Dr. Elliott concluded that, even accepting the unreliability of the C-SSRS test and Mr. Marles' psychiatric history, there was no concrete evidence that Mr. Marles was hallucinating on January 15 or 18 or that he was suffering from severe anxiety sufficient to trigger a duty to order a mental health consultation [ECF No. 56-4]. Dr. Elliott further concluded that Dr. Pandit's referral to the IC outpatient clinic on the 15th was sufficient in lieu of further action, and that a real-time evaluation was not needed [ECF No. 56-4]. Notably, Dr. Pandit testified that he recommended Mr. Marles go to the IC clinic "because he has a history of PTSD and anxiety," but that the symptoms did not require a real-time psychiatric assessment because "his complaints. . . were more medical" [ECF No. 49-1 p. 13]. The Court notes that VAMC had two mental health experts—psychiatrists Feather and Mooza—on call in the emergency room when Mr. Marles was seen on January 15 and January 18 [ECF No. 50-1 ¶¶ 22–24 (Declaration of April Shelt)]. A reasonable juror could hear both parties' dueling experts testify—concluding that the VAMC did and did not breach its duty to Mr. Marles—and find for either party and therefore, Defendant has not met its burden on summary judgment with respect to whether the VAMC breached its duty owed to Mr. Marles.

Finally, "[e]vidence of breach of duty of care is not enough to succeed on a claim of medical malpractice." *Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 226 (11th Cir. 2021). Plaintiffs must establish causation too. To establish causation in a medical malpractice action, a

16

plaintiff must show that the victim's injury was "proximately caused" by the breach and "more likely than not" resulted from the defendant's negligence. *See Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). And "summary judgment is proper where the evidence supports no more than a single reasonable inference as to proximate cause, or where there are no genuine issues of material fact as to proximate cause." *Chirillo*, 199 So. 3d at 253 (internal citations omitted). "Thus, where reasonable persons could differ as to whether the facts establish proximate causation—i.e., whether the specific injury was genuinely foreseeable or merely an improbable freak—then the resolution of the issue must be left to the fact-finder." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 504 (Fla. 1992).

Defendant argues that Mr. Marles' "independent act of suicide was an intervening and superseding cause which broke the chain of causation and . . . it was not reasonably foreseeable that Rico Marles would commit suicide as a result of any treatment he received on January 15 or January 18, when he denied suicidal ideations and his complaints largely centered on physical symptoms and anxiety related to COVID-19" [ECF No. 55 p. 15]. In response, Plaintiffs counter that Mr. Marles complained of many ailments in addition to Covid-19, including "PTSD, anxiety, insomnia, crazy dreams, hallucinations, and financial stress from trying to start a new business," which should have alerted the doctors to his mental strife and to the foreseeability of his death given his overall medical history [ECF No. 58 p. 14].

The Court concludes that there is a genuine issue of material fact as to 1) whether Mr. Marles' death "more likely than not resulted" from Defendant's actions and 2) whether his suicide was foreseeable to his treating physicians. Regarding whether VAMC's actions, or inactions, more likely than not caused Mr. Marles' death, Plaintiffs' expert, Dr. Zun, concluded that "[m]ore likely than not[,] proper evaluation and treatment would have found serious mental illness necessitating admission or close follow up. This would have made suicide unlikely" [ECF No. 50-5]. On the

17

other side of the balance, Defendant's expert, Dr. Elliott, concluded that "it is too speculative to say that a mental health consult or appointment made for Rico while he was in the WPBVA emergency department would have prevented his suicide"—citing his history of failing to show for appointments and failure to take prescribed medications [ECF No. 56-3 p. 14]. This factual dispute on causation precludes summary judgment. Similarly, there is a genuine issue of fact as to whether Mr. Marles' death was foreseeable. Plaintiffs point to the mandatory Veteran Suicide Training that VAMC doctors must undergo; the fact that Dr. Pandit herself diagnosed Mr. Marles with anxiety; Mr. Marles' history of mental health struggles and host of active psychiatric prescriptions at the time; and the VAMC's specialized experience and knowledge dealing with suicidal veterans [ECF No. 58 pp. 13–15]. Defendant counters that Mr. Marles sought treatment for Covid-19 and anxiety related to a potential diagnosis of Covid-19—not a psychological problem indicative of suicidality [ECF No. 55 p. 17]. The parties' competing versions on foreseeability reveal yet another factual dispute precluding summary judgment in this case.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Report and Recommendation [ECF No. 78] is **ACCEPTED IN PART** and **REJECTED IN PART**, in accordance with this Order.

2. Defendant's Partial Motion to Dismiss [ECF No. 48] is **GRANTED** by stipulation of the parties.

3. Defendant's Motion for Summary Judgment [ECF No. 55] is **DENIED**.

4. The parties' Cross *Daubert* Motions [ECF Nos. 51, 52] are addressed by separate order to follow.

5. On or before **April 11**, **2025**, the parties shall meaningfully confer and file an updated Scheduling Report on remaining pre-trial deadlines (joint pretrial

stipulation, exhibit/witness lists, and proposed findings of fact and conclusions of law), calendar call, and trial (bench).

**ORDERED** in Chambers at Fort Pierce, Florida, this 28th day of March 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record